[No. H007752. Sixth Dist. Apr. 29, 1992.]

THE PEOPLE, Plaintiff and Respondent v.
LARRY GILBERT, Defendant and Appellant.

COUNSEL

Manuel J. Baglanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Aileen Bunney and Joan Killeen Haller, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BAMATTRE-MANOUKIAN, J.**—Larry Gilbert was convicted of committing lewd and lascivious acts upon girls named Amanda and Renee, in violation of subdivision (a) of Penal Code section 288, and of forcibly committing lewd and lascivious acts upon a girl named Donnie, in violation of subdivision (b) of the same section. He was sentenced to 10 years in prison. On appeal he contends there was insufficient evidence of "lewd touching" to support his conviction for lewd acts upon Amanda, and insufficient evidence of force to support his conviction of forcible lewd acts upon Donnie. He also argues that the trial court (1) abused its discretion by failing to hold an evidentiary hearing on the issue of juror misconduct raised by his motion for a new trial, (2) erroneously admitted overly broad expert testimony, (3) abused its discretion by refusing his request to conduct a demonstration for the jury, (4) erroneously applied Evidence Code section 1035.8 to limit his examination of a sexual assault counselor, (5) erred by instructing the jury pursuant to CALJIC No. 2.20.1, and (6) employed a procedure for jury voir dire which unconstitutionally limited his ability to exercise his peremptory challenges.

We conclude the evidence was sufficient and that there was no reversible error. Accordingly we shall affirm the judgment.

The facts underlying the counts on which Gilbert was convicted were outlined in the testimony of the three victims.

The incident involving Donnie occurred in 1986, when she was 11 years old. Donnie, a friend of Gilbert's daughter, testified that she often spent the night at Gilbert's house. On one such night, Donnie woke up and found Gilbert straddling her body. He turned her onto her back and began rubbing her chest. He then placed his hand inside her pants and rubbed her vagina. Donnie pretended to be asleep because she was scared. Gilbert next pulled both his and Donnie's pants down and put his penis in Donnie's vagina. He moved up and down and up again and then pulled his penis out. He pulled Donnie's pants back up and started rubbing her chest again. Gilbert again pulled her pants down and placed his penis inside of her. Then he took his penis out and pulled her pants back up. This was painful for Donnie. Donnie tried to move but Gilbert pushed her back. Gilbert had his forearm over her mouth so that she could not cry out.

Amanda and Renee are sisters. The incidents involving them occurred in 1989, when Amanda was 11 and Renee was 8.

Amanda testified that Gilbert acted as a babysitter for her and her siblings while their parents were away on a trip. The night before Amanda's parents left, Gilbert stayed at Amanda's house, and he and Amanda got up early the next morning to see her parents off. Amanda then got some magazines from her room and sat on the living room floor to read them. Gilbert sat down next to her and began rubbing her lower back from her waist down toward her hip. This lasted for only a few seconds; Gilbert stopped when Amanda's brother came into the room.

The next day Amanda was sitting on the floor in her bedroom when Gilbert came into the room. Gilbert lay down on the floor near Amanda and rubbed her stomach and her right hip down to her groin area. This rubbing lasted for a little while and then Gilbert stopped. On another occasion, Gilbert sat beside Amanda on the couch and rubbed her bare thigh.

Renee testified that Gilbert was at her home babysitting her. Renee was sitting on the couch wearing shorts with a blanket over the lower half of her body because she was cold. Gilbert was sitting beside her on the couch. Gilbert placed his hand underneath the blanket and touched Renee in the area of her vagina. He rubbed this area until Renee moved.

Testifying in his own behalf, Gilbert denied any lewd or lascivious behavior.

*Sufficiency of the Evidence*

"When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the

judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citations.]" (*People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468].)

### (1) *Amanda*

■ Gilbert contends that Amanda's testimony that he had rubbed her stomach, back and thigh was insufficient to support the "lewd and lascivious act" requirement of subdivision (a) of Penal Code section 288. We disagree. The "lewd and lascivious" *act* need not be inherently sexual in nature nor need it be shown that the offender touched the child's private parts. (*People* v. *Dontanville* (1970) 10 Cal.App.3d 783, 795-796 [89 Cal.Rptr. 172].) The crime is committed by any touching of a child with the requisite intent. " '[T]he purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done.' " (*People* v. *Nothnagel* (1960) 187 Cal.App.2d 219, 225 [9 Cal.Rptr. 519], quoting from *People* v. *Hobbs* (1952) 109 Cal.App.2d 189, 192 [240 P.2d 411].)

■ Criminal intent will rarely be shown by direct evidence and must frequently be inferred from a defendant's conduct. "The criminal intent required to prove a violation of section 288 is 'the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires' of perpetrator or victim. The intent with which the act is done is manifested by the circumstances under which the act is committed. [Citation.] Each case involving a lewd act must be decided on its own facts." (*In re Paul C.* (1990) 221 Cal.App.3d 43, 54 [270 Cal.Rptr. 369], fn. omitted; cf. *People* v. *McCurdy* (1923) 60 Cal.App. 499, 502 [213 P. 59].) Intent may properly be inferred from evidence of other specific acts of a similar nature. (Evid. Code, § 1101, subd. (b).)

■ In this case, the People submitted evidence of Gilbert's pattern of conduct with Amanda as well as with other young girls. Upon consideration of the whole record we conclude the jury reasonably could have found, beyond a reasonable doubt, that Gilbert committed the acts with the intent required by the statute. *People* v. *Mansell* (1964) 227 Cal.App.2d 842 [39 Cal.Rptr. 187], on which Gilbert relies, was an affirmance of a superior court order setting aside an information under Penal Code section 288. The case is factually distinguishable from this one: In that case the defendant's acts were susceptible of innocuous explanation and occurred in a place open to the public and within view of third persons, and there was no course-of-conduct

evidence. In any event the determination whether particular evidence meets the requisite standard of substantiality cannot be governed by what other courts, in other procedural contexts, thought of other facts: "Each case . . . must be decided on its own facts." (*In re Paul C.*, *supra*, 221 Cal.App.3d 43, 54.) In this case the evidence was sufficient.

### (2) *Donnie*

 Gilbert next asserts there was insufficient evidence that he used force to commit the described acts upon Donnie. He asks us either to reverse his conviction for violation of subdivision (b) of Penal Code section 288, or to modify the judgment to reflect no more than a violation of section 288, subdivision (a), and in either event to resentence him inasmuch as the trial court's conclusion it could not admit him to probation was influenced by the conviction under subdivision (b). This contention is similarly without merit.

A conviction for violating subdivision (b) of Penal Code section 288 requires the prosecution "to prove that the defendant used physical force substantially different from or substantially greater than that necessary to accomplish the lewd act itself." (*People* v. *Cicero* (1984) 157 Cal.App.3d 465, 474 [204 Cal.Rptr. 582].) Because subdivision (b) subjects the offender to greater penal consequences than subdivision (a) of section 288, the required force must be greater than that necessary to commit the act proscribed in subdivision (a). (157 Cal.App.3d at pp. 472-474.)

Donnie testified that Gilbert's forearm was over her mouth rendering her unable to cry out during the assault described in her testimony, and that in response to Donnie's attempt to move, Gilbert pushed her back. It was not necessary to accomplishment of the described sexual acts that Donnie be prevented from moving or from crying out. Gilbert's described acts therefore exceeded any force necessary to the acts.

The jury was correctly instructed. We conclude the evidence was sufficient to support a finding, implicit in the jury's verdict, that Gilbert used force within the meaning of section 288, subdivision (b).

### *Refusal to Hold an Evidentiary Hearing on Juror Misconduct*

 Gilbert contends the trial court abused its discretion by refusing to hold an evidentiary hearing to determine the truth of his allegation of jury misconduct made in support of his motion for a new trial.

During voir dire by the trial judge, prospective juror Jones disclosed that he had met both trial counsel, that Jones's wife was an attorney who taught

at local colleges and who "used to be a prosecutor with the County," that both trial counsel had been at the district attorney's office with his wife, and that Jones's brother-in-law was a prosecutor for the county. Jones also disclosed that he had served as a juror twice before, once in a civil case and once in a criminal case. He repeatedly asserted that none of this information would affect his ability to be fair and impartial and to return a not guilty verdict if he thought such a verdict was justified.

Jones was selected as an alternate juror. Shortly after trial began one of the jurors became ill and was excused; Jones was seated as a juror and thereafter participated in all proceedings and deliberations and voted for the verdicts.

Gilbert filed a supplemental motion for new trial, on "the ground that counsel for the defense was unaware of a potential juror conflict of interest." He alleged that Jones had failed to disclose that his wife had recently reapplied for a position as, "and had in all probability already been hired as," a deputy district attorney. He further alleged that Jones's wife had in fact gone back to work at the district attorney's office shortly after the jury returned its verdicts. Defense counsel, himself a former deputy district attorney, asserted that he believed on the basis of timing of her return to work that Jones's wife "had been offered *and accepted* such a position prior to her husband being examined as a prospective juror in this case." Gilbert argued that Jones's failure to disclose this potential conflict of interest constituted misconduct.

Gilbert did not request an evidentiary hearing in his written motion. But when the motion was heard, Gilbert asked that the court consider setting the matter for an evidentiary hearing. The court did not do so; it denied Gilbert's motion for new trial with a brief statement of reasons, noting that Jones had himself disclosed the potential conflict of interest, that a thorough voir dire had been conducted, and that defense counsel had been afforded an opportunity to pursue the matter further but had chosen not to.

"[W]hen a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right. Rather such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*People* v. *Hedgecock* (1990) 51 Cal.3d 395, 415 [795 P.2d 1260].) An evidentiary hearing "should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred." (*Id.* at p. 419.)

Gilbert's showing did not meet the prescribed standard. Defense counsel could only speculate as to Jones's knowledge at the time of juror voir dire. The record reflects that Jones was not asked what his wife's future employment plans were. Nor was it incumbent upon him to come forward with such information. Jones's disclosure on voir dire that his brother-in-law was a deputy district attorney and that his wife was a former deputy district attorney indicated that Jones was not attempting to conceal any potential conflict of interest. Since Gilbert's assertions raised no more than a speculative possibility of misconduct, the trial court did not abuse its discretion in denying Gilbert's request for an evidentiary hearing.

*Expert testimony*

 Gilbert contends the testimony of a clinical psychologist, Everstine, exceeded the bounds of permissible expert testimony and that the jury was not properly instructed how to use Dr. Everstine's testimony. We reject both contentions.

The prosecutor proposed to call Dr. Everstine, as the last witness in the People's case-in-chief, as "an expert witness in the field of child sexual abuse and the post-traumatic syndrome which affects those children."

██ In a case of alleged child sex abuse, it has been concluded that expert testimony from which it may be inferred that "the victim manifests certain defined characteristics which are generally exhibited by abused children" (*People* v. *Bowker* (1988) 203 Cal.App.3d 385, 391 [249 Cal.Rptr. 886]) is not admissible, and may not be used by the jury, to prove that the victim was in fact abused on this occasion. (*Id.* at pp. 391-393; see *People* v. *McAlpin* (1991) 53 Cal.3d 1289, 1300 [283 Cal.Rptr. 382, 812 P.2d 563]; cf. *People* v. *Bledsoe* (1984) 36 Cal.3d 236, 251 [203 Cal.Rptr. 450, 681 P.2d 291].) But in such a case such expert testimony "is admissible to rehabilitate [the victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.]" (*People* v. *McAlpin, supra,* 53 Cal.3d at p. 1300.) In the leading case on the analogous question of admissibility of evidence of "rape trauma syndrome," the Supreme Court suggested that expert testimony on the syndrome "may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*People* v. *Bledsoe, supra,* 36 Cal.3d at pp. 247-248; cf. *People* v. *McAlpin, supra,* 53 Cal.3d at p. 1301.)

Because the line between impermissible use of expert testimony to prove the child was abused, and permissible use of such testimony to " 'explain the

emotional antecedents of abused children's seemingly self-impeaching behavior . . . .' " (*People* v. *McAlpin, supra,* 53 Cal.3d at p. 1301), is by no means a bright one, the better practice is to limit the expert's testimony to observations concerning the behavior of abused children as a class and to avoid testimony which recites either the facts of the case at trial or obviously similar facts. (Cf. *People* v. *Harlan* (1990) 222 Cal.App.3d 439, 449-450 [271 Cal.Rptr. 653]; *People* v. *Bowker, supra,* 203 Cal.App.3d at p. 393; *People* v. *Roscoe* (1985) 168 Cal.App.3d 1093, 1098-1100 [215 Cal.Rptr. 45].) In *People* v. *Bowker, supra,* on which Gilbert relies, the Court of Appeal went farther, suggesting "there may be more danger" where "the expert gives 'general' testimony," and proposing "several limitations" to avoid the danger that the jury will use the evidence as the basis for an inference that the child was in fact abused (203 Cal.App.3d at p. 393):

(1) "[T]he evidence must be tailored to the purpose for which it is being received. . . . [A]t a minimum the evidence must be targeted to a specific 'myth' or 'misconception' suggested by the evidence. . . . In the typical criminal case, however, it is the People's burden to identify the myth or misconception . . . . Where there is no danger of jury confusion, there is simply no need for the expert testimony." (203 Cal.App.3d at pp. 393-394, fn. omitted.)

(2) "[T]he jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. . . . The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (203 Cal.App.3d at p. 394.)

In this case the prosecutor's predicate for Dr. Everstine's testimony was defense counsel's vigorous credibility-oriented cross-examination of the children Gilbert allegedly had victimized. Patently the predicate was sufficient (cf. *People* v. *McAlpin, supra,* 53 Cal.3d at pp. 1301-1302; *People* v. *Harlan, supra,* 222 Cal.App.3d at pp. 449-450) to establish the relevance of the testimony to the victims' credibility; in this court Gilbert does not assert otherwise. Gilbert's only contentions on appeal are that, in light of *Bowker,* Dr. Everstine's testimony improperly went beyond credibility, and that the trial court's limiting instructions to the jury were insufficient.

(1) *Scope of Testimony*

In the course of her testimony Dr. Everstine made clear that she had interviewed none of the victims and knew none of the facts of this case.

On direct examination, she testified that children who are sexually abused may delay in reporting the molestation because they are unsure of the

consequences and doubt that they will be believed and that the child may first report the molestation to someone other than a parent. Dr. Everstine said most victims do not resist the molestation because they go into a "frozen trauma state" and that, contrary to popular belief, children who are fondled may suffer significant trauma akin to that of a rape victim. Child victims commonly are confused about the details of the molestation and their sense of time and space is distorted.

Dr. Everstine was asked whether a victim's tendency to add or to subtract details on repeated retellings would "in itself make the victim[']s basic charge of being sexually molested any less true[.]" Over objection, she was permitted to reply, in essence, that "children are actually more accurate reporters than adults are. They're less sophisticated liars . . . ." Gilbert also objected to Dr. Everstine's testimony that hearing about the molestation of another child may trigger a child's memory of his or her own molestation and cause him or her to report the incident.

On cross-examination, Gilbert elicited from Dr. Everstine that "[a]dults are found to be not speaking the truth more commonly than children," that "[a]dults are more likely to lie," and that "[t]he younger the child, the more likely the child is to be telling the truth." Dr. Everstine added that sexual abuse by a known person was more likely to result in a delay in reporting than was sexual abuse by a stranger. She acknowledged that she "did not know any of the details of this case."

Gilbert suggested that interviewing methods used by police investigators might cause the child to give false information. After Dr. Everstine indicated that she taught police officers in San Jose how to investigate sexual assaults involving children, defense counsel asked if "in your experience, police officers typically do it [an interrogation of a child] the right way?" Dr. Everstine said "[w]ell, I will tell you since this is a San Jose case, I've had years of training; San Jose Police Department's sexual assault investigation unit has a very fine reputation. Had a national grant a number of years ago and has been considered a model unit." Having elicited this testimony, Gilbert made no attempt to have it stricken.

Gilbert complains that in violation of *Bowker*'s requirement that the expert's testimony "be tailored to the purpose for which it is being received" and "at a minimum . . . must be targeted to a specific 'myth' or 'misconception' suggested by the evidence" (203 Cal.App.3d at pp. 393-394), "the jury heard Dr. Everstine vouch for the credibility of not only the alleged victims but also of the San Jose police officer who investigated the case and was a primary witness against appellant."

Our examination of Dr. Everstine's testimony as a whole, as well as of the examination and cross-examination of the alleged victims, persuades us that in virtually every respect Dr. Everstine's testimony was fastidiously tailored to meet credibility issues defense counsel had raised. The two apparent exceptions to which Gilbert has directed his argument may fairly be characterized as examples of Dr. Everstine's tendency to answer unresponsively.

Her statement to the effect that "children are actually more accurate reporters than adults are" came in reply to a question whether a victim's tendency to add or to subtract details would tend to erode the victim's credibility in the sexual-assault context. Gilbert's objection to the *question* was overruled; the *answer* was patently unresponsive to the question; although defense counsel had repeatedly challenged unresponsive answers he did not do so on this occasion. Indeed, defense counsel elected to reinforce the answer on cross-examination.

Dr. Everstine's testimonial to the reputation of the police sexual assault investigation unit was somewhat more responsive to the question asked, but significantly the question was asked not by the prosecutor but by defense counsel on cross-examination. Again defense counsel did not contemporaneously challenge the answer, by motion to strike or otherwise.

We conclude Gilbert has identified no cognizable error in either instance, primarily because the answers to which he directs his argument had no measurable tendency to lead the jury to infer from the children's subsequent behavior that they had in fact been molested, and thus the answers did not come within the scope of the *Bowker* rules on which he relies. Whether or not the answers came within the scope of Dr. Everstine's expertise, or were otherwise proper, has not been argued to us.

And in any event, by inviting or reinforcing Dr. Everstine's answers by cross-examination and by failing to make pertinent objections or motions, Gilbert may be taken to have waived any arguable error. (Evid. Code, § 353, subd. (a); 3 Witkin, Cal. Evidence (3d ed. 1986) §§ 2012-2014, 2026, pp. 1971-1975, 1987-1988.)

(2) *Limiting Instructions*

■ Before Dr. Everstine testified the trial court proposed, out of the jury's hearing, to instruct the jury that her testimony "can be considered by you only for the purpose of understanding and explaining the behavior of one or more of the alleged victims in this case, and not as proof that the molestation occurred as to any one or more of the victims." Gilbert argued

the instruction was not "strong enough." The court invited suggestions for strengthening the instruction, but the record does not reflect that defense counsel ever offered such a suggestion or any alternative instruction.

At a point in Dr. Everstine's testimony at which the prosecutor had begun a line of specific questions arguably evocative of the circumstances of this case, the trial court interrupted to instruct the jury that "the testimony of Dr. Everstine is being offered to you and may be considered by you only for the purpose of understanding and explaining the behavior of one or more of the alleged victims in this case, and not as proof that the molestation occurred as to any one or more of the victims. [¶] So it's being offered for the sole purpose of helping you to understand and explain the behavior of children as a class, generally, and to help you understand if that's—if it's determined by you to apply, the behavior of the alleged victims in this case, but not for the purpose of proving that the molestation occurred as to any one or more of the victims."

As part of its final instructions to the jury, the court said "[y]ou are reminded that testimony of Dr. Everstine was offered and may be considered by you only for the purpose of understanding and explaining the behavior of one or more of the alleged victims in this case, and not as proof that the molestation occurred as to any one or more of the alleged victims."

Gilbert complains that these instructions did not advise the jury that evidence of this kind "*assumes* that a molestation has in fact occurred and that the complaining witnesses['] reactions were common explanations of a factual event," and therefore the jury was allowed to use the evidence "without being fully instructed that this evidence is premised on a molestation having in fact occurred."

There was no error. Gilbert's argument is based on explanatory language, in *Bowker*, which in our view was patently intended to make the opinion clear to the attorney or judge who read it and not to be incorporated (at least in the unelaborated form Gilbert suggests) in an instruction to the jury. The instructions the trial court gave were clear, accurate, and sufficient. We would consider it unnecessary, and potentially confusing and misleading, to add the language Gilbert proposes.

*Demonstration*

■ Gilbert contends the trial court abused its discretion by ruling his proffered demonstration evidence inadmissible. The contention is meritless.

■ Evidence of demonstration engaged in to test the truth of testimony that a certain thing occurred is admissible only where (1) the demonstration

is relevant, (2) its conditions and those existing at the time of the alleged occurrence are shown to be substantially similar and (3) the evidence will not consume undue time or confuse or mislead the jury. (*People* v. *Bonin* (1989) 47 Cal.3d 808, 847 [254 Cal.Rptr. 298, 765 P.2d 460].) The party offering the evidence bears the burden of showing that the foundational requirements have been satisfied. (*Id.* at p. 847.) The determination whether to admit demonstration evidence requires the trial court to decide whether the evidence is "of any value in aiding the jury." (*People* v. *Terry* (1974) 38 Cal.App.3d 432, 445 [113 Cal.Rptr. 233].) The trial court's ruling on admissibility will be reversed only where the trial court abused its broad discretion. (*People* v. *Boyd* (1990) 222 Cal.App.3d 541, 565-566 [271 Cal.Rptr. 738]; *Culpepper* v. *Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 522 [109 Cal.Rptr. 110]; *Garcia* v. *Hoffman* (1963) 212 Cal.App.2d 530, 535 [28 Cal.Rptr. 98].)

■ Gilbert requested permission to present an in-court demonstration using live models with the same physical characteristics as himself and Donnie, to reenact the events to which Donnie testified. The models would not, however, engage in any flesh-to-flesh contact. Gilbert made an offer of proof that he was over 6 feet tall, weighed slightly under 300 pounds and was approximately 45 years old at the time of the incident. Donnie had testified that, at the time of the incident, she was between 3 feet, 6 inches, and 4 feet tall, weighed between 70 and 80 pounds, and was 11 years old.

Gilbert presented two models who were to represent himself and Donnie at the time of the incident. The 39-year-old male model was 5 feet, 11 inches tall and weighed 302 pounds. The 26-year-old female model was 5 feet, 1 inch tall and weighed 94 pounds. Noting the disparity between the models and the participants in the alleged incident, the court said "you have to get past the foundational requirements for similarities, which I feel you haven't met even on the physical characteristics, not even mentioning physical coordination, emotional state, the conditions that existed at the time." The court ruled the evidence inadmissible because Gilbert had failed to establish that the conditions of the experiment would be substantially similar to the alleged occurrence at issue.

The trial court's ruling was well within its sound discretion.

*Sexual Assault Counselor Privilege*

In the course of cross-examination of Renee defense counsel asked her whether she remembered, when she was in the second grade, "some grown-ups came and did a program on telling you about child abuse and good

touches and bad touches and things like that[.]" Renee answered "[n]o" and added that "[t]here was never a program like that."

In Gilbert's case-in-chief, defense counsel elicited testimony that a program (referred to in the record as a "CAPS program") such as he had described to Renee had in fact been presented to second graders at Renee's school. The goal of the CAPS program "seems to be to let children know, to know that they could talk to a teacher, a parent, a friend, if anything had occurred." As described in testimony the program involved skits, one of which represented conduct broadly similar to that of which Renee had accused Gilbert.

Subsequent colloquy between the court and counsel made clear that the defense wished to propose an inference that Renee's accusation was based not on criminal conduct by Gilbert but on the CAPS program skit, and that for this purpose the defense wished to establish that Renee, notwithstanding her denial, had been present at one of the program sessions. The defense proposed to introduce school attendance records to show that Renee had been at school, and had not been excused from attending the CAPS program session, on the day of the session for her second grade class. The defense was ultimately permitted to introduce records and testimony to this effect, and also to elicit from a CAPS counselor, Varela, the dates and nature of the program sessions, with a description of the skit that generally resembled Renee's accusation.

The defense also proposed to explore, with witnesses from the CAPS program, the possibility that Renee might have approached one of the CAPS counselors, at or shortly after the CAPS program session for her class, to accuse her own father of sexual abuse. The court conducted a hearing out of the jury's presence at which Varela testified. Varela explained that after their presentations "we invite children to come speak to us if they would like to." The counselors keep a list of names of the children who do speak with them, but add further notes only "if a child tells us something that is reportable" as an incident of child abuse under applicable statutes. (Cf., e.g., Pen. Code, § 11164 et seq.) Varela testified that at the program session concerning which she had been called to testify she had taken names but had made no notes other than of the names themselves.

Varela asserted that her list of names was confidential, invoking (among others) the sexual assault victim counselor privilege declared in Evidence Code section 1035.8. After an in camera hearing the court stated for the record that Varela had asserted the privilege with respect to any information she might have received from any individual after the program session,

including the names of any such individuals. The court ruled that the defense "may ask this witness no questions with regard to the names of any persons who may have approached her following the presentations. And you may not ask her any questions with regard to any information she may have received[, but] . . . that's moot anyway because there is no information." Defense counsel acquiesced in this ruling; thereafter counsel pursued neither the possibility that Renee might have accused her father of sexual abuse nor the question whether Renee's name appeared on Varela's list.

But then defense counsel asked whether he could ask Varela if she remembered whether Renee was present for the CAPS program session itself. The court ruled that the question could not be asked. Defense counsel reminded the court that Renee had denied participating in the program, and indicated he wished to prove as positively as possible that Renee had in fact participated. The court said "[y]ou'll have to prove it some other way. You're not going to prove it through this witness, is what I'm telling you." When the court expressed a concern that a revelation that a particular child had come forward to talk to a counselor would tend to discourage children from coming forward, defense counsel suggested that Varela's testimony could be sanitized to avoid reference to the fact a particular child had come forward after the session: "I could ask this witness, Do you remember Renee being there? And her answer could be yes. Without getting into how it is that she remembers it. And that way we don't breach the privilege." Defense counsel protested that Renee's presence for the open session of the CAPS program was itself "a significant item of evidence," and that to exclude the evidence upon the court's theory of potential chilling effect would deprive Gilbert of a fair trial. The court reaffirmed its ruling. Gilbert now assigns this ruling as error.

Evidence Code section 1035.8 provides in pertinent part that "[a] victim of a sexual assault, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between the victim and a sexual assault victim counselor . . . ." The parties apparently agree, at least for purposes of analysis, that Renee was a victim and Varela a counselor within the meaning of section 1035.8. If Varela in fact "received or made a communication subject to the privilege," then in the circumstances of record she was required to claim the privilege. (Evid. Code, § 1036.)

 Gilbert argues in essence that by refusing to permit the question whether Varela recalled if Renee had attended the session itself the trial court overextended the privilege, and that the error was reversible. The People respond that the trial court applied the privilege correctly, and, alternatively, that any error was harmless. Neither side has briefed these issues in depth.

We conclude that the trial court should have permitted defense counsel to ask the sanitized question, but that its error in refusing to do so was harmless in all the circumstances.

Patently the purpose of the sexual assault victim-counselor privilege is to protect the confidences of one "who consults a sexual assault victim counselor for the purpose of securing advice or assistance concerning a mental, physical, or emotional condition caused by a sexual assault" (Evid. Code, § 1035) and thus to encourage those who believe they have been victimized by sexual assault to come forward and to make full and frank reports so that they may be advised and assisted. If information given to the sexual assault counselor is relevant evidence of facts material to a criminal or child-abuse proceeding, the trial court may compel disclosure of the information if but only if the court determines that "the probative value outweighs the effect on the victim, the treatment relationship, and the treatment services . . . ." (*Id.* § 1035.4.) In short the privilege is designed to protect one who considers himself or herself the victim of a sexual assault, and to avoid any disincentive to such a person to seek help from a qualified sexual assault counselor.

The record makes plain that the nonconfidential CAPS program session would have ended before Renee would have sought a confidential meeting with the counselors. The trial court's reasoning appears to have been:

(1) That it would be apparent to Renee, and to individuals who might otherwise come forward on subsequent occasions, that the counselor would be able to say Renee had been present only if the counselor had made a contemporaneous note of Renee's name;

(2) That the counselor would have made such a note only if Renee had come forward for a confidential meeting; and therefore

(3) That the counselor's recollection of Renee would be tantamount (in the minds of Renee and other victims) to a declaration that Renee had considered herself a sexual assault victim and had sought advice or assistance as such.

To justify the suppression of potentially relevant evidence implicit in exercise of any evidentiary privilege the applicability of the privilege must be quite clear. In our view the series of inferences on which the trial court apparently relied were too tenuous to meet this test. The question as defense counsel proposed to phrase it would sufficiently have protected the purposes of the privilege and the court, by establishing appropriate ground rules in advance, could readily have prevented allusion to the fact Renee's name

appeared on Varela's list. The court should have permitted the sanitized question.

But the trial court's ruling did not significantly prejudice Gilbert's attempt to prove that Renee was present at the CAP program session. In fact the school records were admitted, and they provided strong support for an inference that Renee was present. Gilbert refers to "how easily the prosecution was able to rebut the inference," but Gilbert's reference is to a short series of questions to Renee's teacher in which the prosecutor, on cross-examination, was able to elicit the teacher's acknowledgment that the program "[c]ould have been" in February, rather than in March of 1988, and that the teacher did not "offhand know" whether Renee was absent in February. Far from effective rebuttal, these responses illustrated nothing more than that the teacher was willing to acknowledge her memory might not be infallible.

The erroneous ruling was not of constitutional dimension. It is not reasonably probable that a result more favorable to Gilbert would have been reached in the absence of the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

*CALJIC No. 2.20.1*

As required by Penal Code section 1127f, on the People's request the trial court instructed the jury that, in essence, the testimony of a witness who is 10 years of age or younger should not be discounted solely because he or she is a child. The instruction was directly pertinent to Renee, who was nine years old when she testified. Gilbert asserts that with respect to Renee the instruction denied him due process and equal protection of the laws. We find Gilbert's argument unpersuasive.

Penal Code section 1127f provides that "[i]n any criminal trial or proceeding in which a child 10 years of age or younger testifies as a witness, upon the request of a party, the court shall instruct the jury, as follows: [¶] In evaluating the testimony of a child you should consider all of the factors surrounding the child's testimony, including the age of the child and any evidence regarding the child's level of cognitive development. Although, because of age and level of cognitive development, a child may perform differently as a witness from an adult, that does not mean that the child is any more or less credible a witness than an adult. You should not discount or distrust the testimony of a child solely because he or she is a child."

The required instruction has been incorporated into CALJIC No. 2.20.1, which adds a definition of "cognitive" ("the child's ability to perceive, to

understand, to remember, and to communicate any matter about which the child has knowledge") as well as language to particularize the instruction to a witness or witnesses 10 years of age or younger where there has also been testimony by one or more children more than 10 years old. The trial court gave CALJIC No. 2.20.1, with the added definition and particularizing language, virtually verbatim.

 Gilbert first argues that the instruction, and thus Penal Code section 1127f as applied in this case, denied him due process because the instruction "lessened the government's burden of proof" because it "effectively instructs the jury to unduly inflate the testimony of a child witness." He acknowledges that a similar argument was rejected in *People* v. *Harlan, supra,* 222 Cal.App.3d at pp. 455-457, but asserts that *Harlan* was incorrectly decided.

Our own consideration of Penal Code section 1127f and CALJIC No. 2.20.1 satisfies us that *Harlan* reached the right result. In *People* v. *Jones* (1990) 51 Cal.3d 294 [270 Cal.Rptr. 611, 792 P.2d 643], the Supreme Court made clear that, far from "unduly inflat[ing]" the child's testimony, section 1127f "adopted the modern view regarding the credibility of child witnesses . . . ": "[I]t is now well established that a child's testimony cannot be deemed insubstantial merely because of his or her youth. . . . [¶] Recent studies have undermined traditional notions regarding the unreliability of child witnesses, their untruthfulness, susceptibility to leading questions, or inability to recall prior events accurately. 'Empirical studies have produced results indicating that most of these traditional assumptions are completely unfounded.' [Citations.]" (51 Cal.3d at p. 315.) The instruction tells the jury not to make its credibility determinations solely on the basis of the child's "age and level of cognitive development," but at the same time invites the jury to take these and all other factors surrounding the child's testimony into account. The instruction provides sound and rational guidance to the jury in assessing the credibility of a class of witnesses as to whom " 'traditional assumptions' " may previously have biased the factfinding process. Obviously a criminal defendant is entitled to fairness, but just as obviously he or she cannot complain of an instruction the necessary effect of which is to increase the likelihood of a fair result. There was no denial of due process.

 Gilbert's alternative argument is that the instruction (and thus, ultimately, Pen. Code, § 1127f) denied him equal protection of the laws, in that:

(1) The court gave no comparable instruction "such as, 'do not discount or distrust the testimony of the defendant solely because he is on trial for his liberty' " and thus discriminated between child witnesses and the defendant; and

(2) The instruction discriminates between defendants accused by a child and those accused by an adult, in that an alleged child victim 10 years of age or younger receives "preferential treatment."

By virtue of the equal protection clauses of the federal and California Constitutions, the state may not draw arbitrary distinctions, in the bestowal or denial of rights, as between persons or classes of persons. In this instance the only distinction involved is that between witnesses 10 years of age or younger and witnesses older than 10. Penal Code section 1127f does not create the distinction but simply seeks to ameliorate its perceived negative impact upon the integrity of the factfinding process. The statute thus is wholly rational and not at all arbitrary. Nor does it single out criminal defendants or child victims: It applies to any criminal case in which a witness, whether or not an alleged victim and whether called by the prosecution or the defense, is 10 years of age or younger. The suggestion that in a case such as this the Penal Code section 1127f instruction should be balanced by a comparable instruction to the effect the defendant's testimony should not be discounted simply because he is the defendant is specious: Obviously the defendant's self-interest bears directly on his credibility; to take this rationally based consideration from the jury would be patently arbitrary.

We perceive no arbitrary distinction whatsoever. The instruction was appropriate to the record.

*Limitation on Jury Voir Dire*

Gilbert argues that ballot Proposition 115, approved by the voters shortly before his trial began, imposed limitations on his opportunity to question prospective jurors more strict than those applicable to a civil litigant and thus he was denied equal protection of the laws.

In pertinent part Proposition 115 enacted new Code of Civil Procedure section 223, which provides: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases. [¶] Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause. [¶] The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause

any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."

Neither Proposition 115 nor Code of Civil Procedure section 223 was mentioned at the time of jury selection in this matter, but the trial court described and then followed a procedure consistent in most respects with Code of Civil Procedure section 223. Before selection began the court advised counsel, among other things, that "the Court will do almost all of the voir dire; that each counsel at the conclusion of the Court's voir dire and the juror's response to the questionnaire form will be given fifteen minutes each—and I will enforce that time limit very carefully—to follow up on any areas where they felt the jurors' answers were equivocal or needed further pursuit, but not to ask original questions. [¶] I have entertained several questions from both counsel and have agreed to incorporate those in the Court's voir dire and invite counsel to add any additional questions as we go along, and the Court will certainly consider them." The court advised counsel that they each would have 10 peremptory challenges for selection of the 12 regular jurors and 2 additional peremptory challenges for selection of 3 alternate jurors.

In the course of jury selection the court did ask a number of questions of the prospective jurors. Questions submitted by counsel are not identified or otherwise distinguished in the record, but there is no indication in the record that the court failed to ask any question proposed by either side. The court's lengthy examination can fairly be characterized as impartial and quite thorough. At the end of it the court did permit counsel to inquire, beginning with defense counsel. In the course of defense counsel's voir dire the court remarked in a neutral way that one of counsel's questions might have been covered by a question the court had asked, but then admonished counsel to "[a]sk anyone you wish any questions you like as long as they're within the framework of our discussion." It appears that defense counsel was permitted to question the jury for approximately 20 minutes.

After the prosecutor's questions, defense counsel passed the panel for cause; he remarked that he did so "[w]ithin the structures [*sic*] of the Court's requirements" but did not elaborate on his remark. In selecting the initial 12 jurors the defense exercised 2 of its 10 peremptory challenges; after the initial jurors were selected the defense exercised both its peremptory challenges allotted to selection of alternate jurors.

So far as the record shows, defense counsel did not interpose any objection relevant to the jury-selection process or (apart from his reference to "the

structures of the Court's requirements") comment in any way on the procedures the court followed. Aside from the question of juror misconduct involving Juror Jones, discussed above, there is no indication in the record that the jury was either apparently or actually biased or otherwise unsuited to try these facts with respect to these parties.

Gilbert makes his equal protection argument for the first time in this court. Specifically he contends that while Code of Civil Procedure section 223 permits examination of jurors in criminal cases "only in aid of the exercise of challenges for cause," civil litigants may inquire in support of peremptory challenges as well. He acknowledges that he has no due-process right to exercise peremptory challenges or to question the jury personally or through counsel. (*People* v. *Wright* (1990) 52 Cal.3d 367, 419 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1086 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Coleman* (1988) 46 Cal.3d 749, 769 [251 Cal.Rptr. 83, 759 P.2d 1260.) He asserts only that, in essence, once broad voir dire rights are accorded to civil litigants a criminal defendant is entitled to exercise comparable rights as a matter of equal protection of the laws. Gilbert argues that "[t]he error must be deemed reversible *per se* as the resulting jury did not constitute a fair and impartial jury."

The People suggest that because Gilbert did not make his equal protection argument in the trial court he cannot make it here. We respect the general rule of appellate practice on which the People rely, but choose not to apply it in this case because Gilbert's argument raises only issues which a reviewing court may properly address in the first instance. (Cf. *People* v. *Carr* (1974) 43 Cal.App.3d 441, 444 [117 Cal.Rptr. 714]; cf. also *People* v. *Mattson* (1990) 50 Cal.3d 826, 854 [268 Cal.Rptr. 802, 789 P.2d 983].)

Nevertheless we find it unnecessary to reach the merits of Gilbert's argument, for two reasons.

First, the record by no means establishes that the trial court ever limited defense counsel, or itself, to questions "only in aid of the exercise of challenges for cause." (Code Civ. Proc., § 223.) Many of the questions put to the prospective jurors by defense counsel, and even certain of the defense-oriented questions put by the court presumably in response to defense requests, were at best marginally relevant to the prospective jurors' statutory qualifications or actual or implied bias. Gilbert has not suggested, and certainly the record does not show, that he was denied the opportunity to ask any particular question of a kind a civil litigant might properly have asked on voir dire. In short the record does not substantiate an assertion that Gilbert was in fact denied an opportunity to voir dire as extensively as could

a civil litigant. We will normally consider the constitutionality of a statute only at the instance of a party who can show both that the statute has been applied to him or her and that he or she has been injured by the application. (*People* v. *Perry* (1931) 212 Cal. 186, 193 [298 P. 19, 76 A.L.R. 1331]; *Laborers' Internat. Union of North America* v. *El Dorado Landscape Co.* (1989) 208 Cal.App.3d 993, 1000 [256 Cal.Rptr. 632].)

Second, the record neither bears out Gilbert's assertion that the jury as selected "did not constitute a fair and impartial jury" nor suggests that the trial court's jury-selection procedures prejudiced Gilbert in any other way. It follows that any error in those procedures, constitutional or not, must be deemed to have been harmless and thus would require reversal only if the error were (as Gilbert suggests) reversible "per se." (Cf. generally 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Reversible error, §§ 3303-3311, pp. 4084-4095.) We respectfully suggest that under recent decisions reversal without a specific showing of prejudice will be warranted only where the error will inevitably prejudice the defendant by affecting his or her fundamental rights to the assistance of counsel at a fair trial, with full opportunity to be heard, before an impartial judge and jury. (Cf. *Rose* v. *Clark* (1986) 478 U.S. 570, 576-579 [92 L.Ed.2d 460, 479-481, 106 S.Ct. 3101]; *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 681-682 [89 L.Ed.2d 674, 684-685, 106 S.Ct. 1431]; *People* v. *Odle* (1988) 45 Cal.3d 386, 413-415 [247 Cal.Rptr. 137, 754 P.2d 184].) This is by no means such a situation.

Were we to reach the merits we would agree with the conclusion, reached in two newly published opinions of this court, that Code of Civil Procedure section 223 does not deny equal protection to criminal defendants. (*People* v. *Boulerice, ante,* p. 463 [7 Cal.Rptr.2d 279]; *People* v. *Leung, ante,* p. 482 [7 Cal.Rptr.2d 290].)

The judgment of conviction is affirmed.

Cottle, Acting P. J., and Agliano, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied August 12, 1992.

---

*Retired Presiding Justice of the Court of Appeal, Sixth District, sitting under assignment by the Chairperson of the Judicial Council.