Filed 6/10/16  P. v. Johnson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C076866 |
| v. | (Super. Ct. No. 13F1466) |
| LUKE WILLIAM JOHNSON, | |
| Defendant and Appellant. | |

Defendant Luke William Johnson, an opiate addict, attempted to scare Kristin Wurner into handing over her cell phone so he could trade the phone for drugs.  He confronted her as she walked back to her apartment after accompanying her daughter to the school bus stop.  Holding out an emergency window punch, a tool used to break automobile glass in case of emergency that also had flashing lights on top of the device, defendant said, among other things, "I'm going to fucking kill you."  When Wurner said she was calling the police and ran towards her apartment, defendant briefly gave chase, yelling:  "I'm going to kill you."

1

Defendant was convicted by jury of making a criminal threat.[1] (Pen. Code, § 422.)[2] Following a bifurcated court trial on defendant's prior convictions, the trial court found defendant was previously convicted of two serious felony offenses within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12), and he committed the present felony offense while released on bail or on his own recognizance after having committed a previous felony offense (§ 12022.1). At defendant's request, the trial court exercised its discretion to strike one of his prior serious felony convictions for purposes of sentencing, and sentenced defendant to serve an aggregate determinate term of 18 years in state prison as a one-strike offender.[3]

On appeal, defendant claims the trial court abused its discretion and violated his federal constitutional right to present a complete defense by depriving him of the opportunity to demonstrate for the jury a "newer version" of the emergency window punch that had red and blue flashing lights, as opposed to the actual device that appeared to have only red flashing lights when that item was demonstrated for the jury. We disagree. As we explain, preventing the proposed demonstration under Evidence Code section 352 was not an abuse of discretion. Nor did the trial court deprive defendant of the right to present a complete defense. While the color of the flashing lights had some probative value, this value was very slight. We therefore affirm the judgment.

---

[1] He was found not guilty of attempted kidnapping, a charge that was based on Wurner's testimony that defendant, who stepped out of codefendant Michael Anthony Carter's car just before he confronted her, demanded she "get in the car" before threatening to kill her.

[2] Undesignated statutory references are to the Penal Code.

[3] Defendant was also sentenced in three other cases that are not relevant to the issue raised in this appeal, bringing his total prison term to 21 years, 4 months.

FACTS

On the morning of March 6, 2013, Wurner walked her daughter to the bus stop in front of their apartment complex. As they waited for the school bus to arrive, a Volkswagen Rabbit pulled into the complex and parked. Defendant was in the passenger seat. The driver was codefendant Carter. They had spent the previous night doing drugs and engaging in various activities that will be described in greater detail shortly. When the school bus picked up Wurner's daughter, Wurner began to walk back to her apartment that she also shared with her mother and sister.

According to Wurner, as she passed the Volkswagen, defendant rolled down the passenger side window and said: "Stop, get in the car. I'm going to fucking kill you." She laughed and said: "Are you stupid?" As Wurner continued towards her apartment, defendant pointed "what [she] thought was a gun" at her and repeated his previous statement. As Wurner explained, defendant held the object out in front of him with his fingers interlaced. The object was black with a red light on top. At this point, Wurner pulled out her cell phone and told defendant she was calling the police. Defendant got out of the car and approached Wurner as she tried, unsuccessfully, to reach a 911 operator. Wurner ran, screaming, "Help me," until she reached her front door. Defendant briefly gave chase, yelling: "I'm going to kill you." Wurner's mother was home at the time. She heard Wurner screaming outside, ran to the front door, and opened it to let her inside. As Wurner ran inside the apartment, she yelled: "Help me. They have a gun." Wurner then locked the door behind her and called 911. Meanwhile, Carter turned the car around and picked up defendant, yelling at him: "Come on, get in the car, let's go. Get in the fucking car, bro. Let's go." The Volkswagen drove away as Wurner told the 911 operator what had happened. Wurner also provided the operator with a description of the vehicle and a partial license plate.

3

Officer Brad LaCroix of the Redding Police Department arrived at Wurner's apartment a short time later. He described her demeanor as "obviously scared," explaining: "You could tell she had been crying. Physically shaking, she was so scared." About 10 to 15 minutes into taking Wurner's statement, the officer was advised over the radio that a possible suspect vehicle had been contacted. Carter had driven defendant to Walmart, parked the car, and proceeded to smoke some marijuana in the parking lot. Police arrived a short time later and took both defendant and Carter into custody. Officer LaCroix then drove Wurner out to the parking lot, where she positively identified defendant as the man who pointed what she believed to be a gun at her. As mentioned, the object defendant pointed at Wurner was actually an emergency window punch that was recovered from the Volkswagen. The officer who found the object described it as "a pretty strange looking thing," "like a brass knuckle, but had a pulsating red light on it."

Defendant and Carter each testified in his own defense. Their testimony was largely consistent and may be summarized as follows. The night before defendant's confrontation with Wurner, he and Carter met for the first time at Win-River Casino. They were both habitual opiate users and struck up a conversation while smoking cigarettes in front of the casino. Defendant offered to share some heroin with Carter in exchange for a ride to his parents' house. Carter agreed. (After using the heroin, defendant realized he needed to get more opiates or he would "wake up sick the next morning." (Because defendant lost all of his money at the casino, he decided to steal property to trade for the drugs. To this end, Carter and defendant drove to a homeless encampment where defendant broke into a vehicle but found nothing of value inside. Carter then drove defendant to his parents' house, where defendant changed his

4

clothes, packed a backpack, and left again with Carter in search of a way to get more drugs.

Their next stop was defendant's friend's residence, where they used Xanax, an anti-anxiety medication, and methamphetamine. They then picked up one of Carter's friends and went to Walmart, where Carter bought fuses for his car while defendant stole the emergency window punch. According to defendant, the device had flashing red and blue lights that "reminded [him] of a police light or some kind of like emergency vehicle light." Carter agreed the device had red and blue lights. Carter and defendant then dropped off Carter's friend. On the way, they were passed by a police car, which caused them to "freak[] out" because they were high. Defendant told Carter to pull over, which he did. Defendant then "stashed" a scale he had in his backpack somewhere next to the road. They drove to a local grocery store with a public power outlet to charge their cell phones. By this time, the sun was starting to rise. Carter and defendant left the store and retrieved defendant's scale. They then drove around while defendant sent text messages to various people he thought might have drugs, but his phone kept shutting itself off. He asked Carter to pull over while he tried to resolve the problem.

Wurner's apartment complex happened to be the place Carter pulled into. According to defendant, when he saw Wurner walking past the car, he said to Carter: "This will be funny." Wearing aviator sunglasses, defendant put one end of a phone charger in his ear and tucked the other end in his shirt to mimic a law enforcement earpiece. He then got out of the car, shined the emergency punch's flashing lights at Wurner, and said: "I'm a narcotics task force officer. Freeze." As defendant did so, he saw Wurner was holding a smart phone and decided to take it from her to trade for the drugs he wanted. Wurner responded, "You're not a cop," and started to jog away. Defendant then walked quickly towards her and again told her to stop, which caused her

to run and scream for help. At this point, according to defendant, he turned back towards the car as Carter was yelling for him to get inside. They then drove to the Walmart parking lot, where they were taken into custody. Defendant denied threatening to kill Wurner and denied ordering her to get in the car.

As mentioned, the jury found defendant guilty of making a criminal threat and not guilty of attempted kidnapping.

## DISCUSSION

Defendant claims the trial court abused its discretion and violated his federal constitutional right to present a complete defense by depriving him of the opportunity to demonstrate for the jury a "newer version" of the emergency window punch that had red and blue flashing lights, as opposed to the actual device that appeared to have only red flashing lights when that item was demonstrated for the jury. We disagree.

### A.

### *Additional Background*

After defendant testified, defense counsel asked for permission to use "a newer version" of the emergency window punch during her closing argument, explaining: "This one [referring to the actual device (Exhibit No. 16)] -- I'm assuming that the batteries are low. I was just going to use that as a demonstrative exhibit. There's certainly been testimony from [Carter and defendant], that that device initially flashed red and blue. And so, I've already talked to the Marshals about how to bring that into the courtroom, but I wasn't certain there would be any requests that [defendant] verify that it looks the same." The prosecutor objected, arguing that to allow defense counsel to show the jury a different device during her closing argument, one "that fits the version of the events that the [defense] witnesses testified to," would not be "an appropriate use of demonstrative evidence" because the actual device was available: "That's the item that

6

everybody testified was used. And so, that's the item that I think we should be talking about in closing argument." Defense counsel then suggested she be allowed to recall defendant to testify the newer version of the device flashed the same colors the actual device flashed on the day of the incident.

The trial court denied defense counsel's request, explaining it did not believe counsel would be able to lay an adequate foundation for the proposed demonstration, e.g., that "the red and blue functionality of the [demonstration] device . . . is the same as the functionality of the actual device on the date of the incident." The trial court further ruled the demonstration would be excluded under Evidence Code section 352, explaining the laying of such a foundation would consume a significant amount of time and the demonstration would be cumulative of the testimony it sought to demonstrate. The trial court did, however, allow defense counsel to "argue to the jury that the flashing [of the actual device] may not be the same as it was on the date of the incident" because the actual device "has been around since March . . . and it's logical to assume that the battery power may not be the same as it was when it was new."

**B.**

*Analysis*

Demonstration evidence "is admissible only where (1) the demonstration is relevant, (2) its conditions and those existing at the time of the alleged occurrence are shown to be substantially similar and (3) the evidence will not consume undue time or confuse or mislead the jury. [Citation.] The party offering the evidence bears the burden of showing that the foundational requirements have been satisfied. [Citation.]" (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1387.) Similarly, Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue

7

consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." This section "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," but "requires that the danger of these evils substantially outweigh the probative value of the evidence." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744.) The trial court's ruling on the admissibility of demonstration evidence will be reversed only where there is an abuse of discretion. (*People v. Gilbert*, *supra*, 5 Cal.App.4th at p. 1388.)

Defendant's argument on appeal is premised on the notion that the "key" to the prosecution's criminal threat allegation was Wurner's testimony she believed the emergency window punch to be a gun. He argues the trial court's ruling "ensur[ed] that the jury would not see persuasive evidence that [defendant] and Carter were telling the truth about the blue light and that Wurner did not see the device very well." While we agree that whether the device flashed blue and red, as defendant and Carter testified, or just red, as Wurner and Officer LaCroix testified, was marginally relevant to the jury's assessment of their credibility, the trial court was correct to conclude the defense did not carry its burden of showing the lights on the newer version of the device were substantially similar to those on the actual device on the morning of the incident, or supplying the necessary foundation would not consume an undue amount of time when balanced against the limited probative value of the demonstration.

The dispute over the color of the lights was simply not very important to the ultimate determination the jury was required to make regarding whether the prosecution proved the criminal threat charge. "In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another

8

person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.) Wurner testified defendant threatened to kill her as he chased her towards her apartment. While defendant denied making such a threat, the jury obviously did not believe this denial. Defendant did, however, confirm he followed after Wurner as she ran away from him, and his intent at the time was to scare her into handing over her cell phone. Taken together, this testimony is more than sufficient to support the first two elements of the offense. Turning to the third element, the threat was unequivocal, unconditional, immediate, specific, and the circumstances also conveyed both a gravity of purpose and an immediate prospect of execution. This is so regardless of whether Wurner believed the emergency window punch was a gun, and if so, whether such belief was reasonable given the nature of the lights on the device. That Wurner was in sustained fear for her safety was confirmed by both her mother and Officer LaCroix, providing undisputed evidence of the fourth element. And finally, with respect to the fifth element, no reasonable jury would have found Wurner's fear to have been unreasonable under the circumstances, again regardless of whether she believed the emergency window punch was a gun.

Stated simply, regardless of whether the lights on the emergency window punch did or should have revealed to Wurner the device was not a gun, the threat itself and

9

defendant's admitted conduct in following after Wurner as she ran towards her apartment placed her in actual and reasonable fear he would immediately carry out the threat, satisfying each element of the charged crime. Thus, the "key" to the prosecution's criminal threat charge was not Wurner's testimony she believed defendant had a gun, but rather her testimony defendant threatened to kill her. And while the proposed demonstration had some relevance to credibility generally, the probative value was slight compared to the amount of time that would have been consumed establishing the lights on the new device were substantially similar to those on the actual device on the morning of the incident. We therefore conclude the trial court did not abuse its discretion in excluding the proposed demonstration.

Nor are we persuaded by defendant's argument the trial court's decision amounted to a deprivation of his right to present a complete defense. While Evidence Code section 352 "must bow to the due process right of a defendant to a fair trial and his [or her] right to present all relevant evidence of significant probative value to his [or her] defense[,] . . . the proffered evidence must have more than slight relevancy to the issues presented. [Citation.]" (*People v. Burrell–Hart* (1987) 192 Cal.App.3d 593, 599; *People v. Reeder* (1978) 82 Cal.App.3d 543, 553.) Here, as we have already explained, the color of the lights on the emergency window punch did not have significant probative value.

We conclude the trial court did not abuse its discretion or violate defendant's federal constitutional rights by excluding the proposed demonstration under Evidence Code section 352.

DISPOSITION

The judgment is affirmed.

10

         /s/
HOCH, J.

We concur:

         /s/
ROBIE, Acting P. J.

         /s/
BUTZ, J.