Filed 6/25/21  P. v. Argumedo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ERIC JOEL ARGUMEDO,<br><br>    Defendant and Appellant. | H047538<br>(Santa Clara County<br>Super. Ct. No. F1766362) |

## I.  INTRODUCTION

Defendant Eric Joel Argumedo was convicted by jury of six counts of aggravated sexual assault of a child under the age of 14 and seven or more years younger than defendant (Pen. Code, § 269),[1] two counts of committing a forcible lewd or lascivious act on a child under the age of 14 years (§ 288, former subd. (b)(1)), and four counts of forcible rape of a minor age 14 years or older (§ 261, subd. (a)(2)).  The victim in all the counts was defendant's stepdaughter, Doe.  The trial court sentenced defendant to an indeterminate prison term of 90 years to life, consecutive to a determinate term of 48 years.

On appeal, defendant contends that the trial court committed evidentiary errors by (1) admitting testimony that he physically punished his biological daughter on one

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

occasion, (2) admitting a pretext call between Doe and defendant, (3) admitting Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence, and (4) admitting testimony by Doe's boyfriend that he was concerned that he or his family would be hurt by defendant.

For reasons that we will explain, we will affirm the judgment but order clerical errors in the abstract of judgment corrected.

## II. BACKGROUND

The prosecution's theory of the case was that defendant sexually abused his stepdaughter, Doe, on an ongoing basis beginning when she was 11 years old. The prosecution contended that defendant continued to maintain power and control over Doe until she reported the abuse at age 20, after her boyfriend confronted her about defendant's "odd" behavior around her.

The defense theory was that Doe wanted to "break free" from her controlling stepfather so she falsely reported that he sexually abused her as a minor. The defense acknowledged that Doe and defendant were in sexual relationship a few months before Doe went to the police, but contended Doe was an adult and that it was consensual.

### A. *Doe and Defendant's Family*

Doe was the younger of defendant's two stepdaughters. Doe's mother met defendant when Doe was about three years old, and her older daughter was about seven years old. Doe's mother eventually married defendant, and they had two biological children together, a daughter who was four years younger than Doe and a son who was seven years younger than Doe. Doe, who did not have a relationship with her biological father, called defendant "Dad" and viewed him as a father figure. At the time of trial, Doe was 21 years old.

2

## B. *Doe's Personality Change and Defendant's Controlling Behavior*

When Doe was a little girl, she was outgoing and had friends. Doe's personality changed by the time she was 11 years old, which was when the sexual abuse began. She was quiet, shy, reserved, and timid. She did not talk a lot and had few, if any, friends.

Doe testified that she could tell when defendant was angry by his facial expressions. She was scared when he got mad because she had seen him throw items, including picture frames, a copy machine, and a television. Defendant's biological daughter likewise testified that defendant was "scary" when he was angry, and that she had seen him throw a "coffee maker thing at the wall." Similarly, defendant's wife testified that defendant would throw "[w]hatever he had next to him or hit the walls or hit something," including in the presence of the children.

Defendant tried to control Doe by threatening to punish his biological daughter, who was Doe's younger half-sister. For example, defendant told Doe that if she "didn't do something, then he would hit" his biological daughter. More than once, when he was angry at Doe, defendant would punish his biological daughter by taking away her phone.

Defendant was more controlling of Doe than his other children, and he "[d]idn't let [her] do a lot of things." Doe testified that the controlling behavior began when she was 11 years old. Doe spent a lot of time at home because defendant would not let her go anywhere, even with family. For example, defendant allowed his older stepdaughter and his biological daughter to go to a friend's house, but he would not allow Doe. Doe also never went to a school dance, including prom, and was told not to talk to boys because it was "wrong." Doe's sisters went to prom and other dances, and they had friends and boyfriends. Even when Doe was older, she was required to have a sibling accompany her, whereas defendant allowed his older stepdaughter and his biological daughter to go out without an adult or a sibling.

Defendant's wife believed that defendant spent more time with Doe than with her, that he spent too much time with Doe, and that he treated Doe differently than his other

3

children.  Defendant's wife testified that defendant "was always trying to be with [Doe]" and always wanted Doe to go with him, such as to the store, and that he hardly ever invited the other children.  When defendant's wife raised issues about his behavior in relation to Doe, defendant would get upset and aggressive and call his wife "stupid."  To the extent defendant changed his behavior after these arguments, it was only for a couple of days and then he would resume his previous behavior in relation to Doe.

Doe got a cell phone from her mother and defendant.  Defendant would go through Doe's cell phone, checking her messages and calls.  He asked Doe about numbers on her phone and who the numbers belonged to.  Defendant also took her phone to delete text messages from him.

Defendant required Doe to share her location on the phone with him.  He also required her to send a picture or video of her location because he did not believe her when she simply told him.  For example, Doe had to send pictures of a stop sign or a street.  This occurred when Doe was a minor, when she was over 18 years old, and as well as when she was with her sisters.

Defendant never checked his older stepdaughter's phone or his biological daughter's phone.  He also did not require his wife, older stepdaughter, or biological daughter to use a phone location application or to send pictures of their location.

C. *Defendant's Sexual Abuse of Doe*

Doe testified that when she was 11 years old, defendant put a back massager, which vibrated, on her vagina over her clothing 20 times.  It would occur after he pulled her to his bedroom when no one was home.  While it was occurring, Doe would squirm and ask why he was doing it.  Defendant told her not to move.

Beginning when Doe was 11 years old, defendant also kissed her on the mouth.  She testified that his mouth was open, and that she tried to keep her mouth closed.  This occurred more than once when she was 11 years old, and continued to occur every time

4

he inappropriately touched her in other ways when she was 12 years old. She felt scared and disgusted when the kissing occurred.

When Doe was 11 years old, defendant told her to touch his penis. She said no, but he proceeded to put her hand on his penis. Doe tried to pull away, but defendant grabbed her arm. He put his hand on her hand and made her move her hand on his penis for a couple of minutes. Doe could tell that defendant was angry when she tried to pull her hand away because he held her hand tighter. Doe was scared and cried.

Also, when Doe was around 11 years old, defendant told her to put his penis in her mouth. They were in his bedroom, and no one else was home. Defendant made her do this five times.

When Doe was 11 years old, defendant also put his mouth or tongue on her vagina about five times. She unsuccessfully tried to stop him from removing her pants and underwear. Doe cried out for help, but no one was home.

When Doe was 11 years old, defendant tried to put his penis inside her vagina, but it would not go in. This occurred when no one was home and after he had removed her pants. Doe cried, tried to push him off, and asked why he was doing this to her. He tried again on multiple occasions.

At some point, when Doe was 11 or 12 years old, defendant was able to put his penis inside her vagina. When asked at trial how many times this happened, Doe testified, "Too many to know." During the incidents, Doe was angry and cried, and she unsuccessfully tried to push him off. Defendant held her down. Doe testified that when defendant started putting his penis in her vagina, the oral sex stopped.

Doe testified that at age 11, she did not try to get help because she was scared. She explained that she did not know what was going to happen to her, her mom, or her siblings, and that she was scared defendant might hurt them. Doe was also scared that defendant would deny the incidents, and that no one, including her mother, would believe her. Doe further testified that she thought her mother might think it was Doe's fault.

5

Doe testified that defendant continued to put his penis in her vagina when she was 13, 14, and 15 years old. Doe tried to prevent him from taking her pants off and told him to stop, but he would not. When asked how many times it occurred when she was 14 and 15 years old, she indicated that it was "[t]oo many" times to count.

Defendant started taking Doe to work with him on the weekends when she was 11 or 12 years old. Defendant ran a business for cleaning, painting, and carpet cleaning.

When Doe was 15 years old, defendant's business contracted with a large apartment complex to clean model apartments and apartments that had just been vacated by tenants. Defendant would take Doe to empty apartments, lock the apartment, put her on the floor of a closet, and put his penis in her vagina. Doe would cry and try to push him off. Doe unsuccessfully tried to avoid going to work with him. Defendant did not require his older stepdaughter or his two younger biological children to accompany him to work.

Around this time, Doe's whole family moved to her maternal grandparents' home for several months. Defendant continued putting his penis in her vagina about 10 times during this period when no one else was at the grandparents' home. Doe was home most of the time, attending an online program for high school. Defendant, over the objection of Doe's mother, had made the decision to have Doe homeschooled during most of freshman year of high school through her junior year. Defendant did not put either his older stepdaughter or younger biological daughter in a homeschooling program.

Doe testified that on one occasion, she was doing computer work in her parent's bedroom at her grandparents' house. Defendant closed and locked the bedroom door, took off his pants and her pants, and pushed her onto the bed. They heard several knocks on the bedroom door. It was her grandfather, who had unexpectedly returned home. Defendant put Doe's pants on and his own pants on and then opened the door. Doe testified that she returned to the computer because she was scared. She testified that defendant started laughing and that her grandfather left.

6

The grandfather testified that when the door opened, Doe ran out of the room scared and defendant, who appeared angry, said he was going to punish her. The grandfather testified that he asked Doe what was going on, and that she said, "Nothing."

Defendant continued to rape Doe at home and at the apartment complex when she was 16 years old. He also touched her breasts.

When Doe was 17 years old, the family moved out of the grandparents' house and into another house. Defendant continued to rape Doe when no one else was home. Doe unsuccessfully tried to prevent him from taking off her pants and unsuccessfully tried to keep him off her. Defendant never used a condom and would pull out from Doe before ejaculating.

Throughout the entire time, Doe testified that she continued to have a "[n]ormal" relationship with defendant, meaning she acted like nothing was happening. She testified that "he still was supposed to be my father figure" and that she loved him sometimes as a father. Doe also "thought maybe if [she] was nice he wouldn't do that to [her] anymore." She was also scared of what defendant would do if she said something, and she was scared no one would believe her.

When Doe was in her mid or late teens, the whole family was in the vehicle traveling on a trip. Defendant was driving when he received a text from someone. His wife picked up his phone and read the message to him. Underneath that message, she saw messages that defendant had apparently sent to Doe. One of his messages to Doe stated, "Baby, I love you. I love you so much." Defendant's wife asked, "What's this?" Defendant grabbed the phone and deleted all the messages. Defendant's wife testified that she then asked Doe, who was in the vehicle, a question. Doe responded to the question, and then defendant's wife started crying.

Doe testified that she started documenting what was happening to her in a notebook when she was 17 years old. She had the notebook for about two months and had written about four pages in it before her younger half-sister, defendant's biological

7

daughter, found it. After defendant learned about it, he asked Doe why she was writing about him and told her, "I don't want anybody to see it." Doe was scared that he had learned about the notebook. She threw it away because she understood defendant to be telling her to get rid of it.

Doe testified that she only spoke to defendant about what was happening in relation to her menstrual cycle – she would tell him that she did not get her period, or he would ask if she had gotten it.

When Doe's homeschooling ended and she returned to high school in person, she started making friends at school. Defendant, however, always had "an excuse" about why he did not like any of Doe's male friends. Defendant's wife testified that Doe once brought a male friend from high school to the house for a family barbecue. Defendant took the boy to the backyard and had an "aggressive conversation" with the boy. Defendant's wife heard a portion of the conversation during which defendant stated, " 'If you ever hurt my daughter, I will come back to you.' " When defendant saw his wife, he asked her to go inside. After the incident, Doe's male friend never came back.

Doe testified that when she turned 18 years old, she remained living at home. Defendant also continued to rape her, continued to control her, and continued to check her phone and want to know her location. Doe testified that she couldn't stop the sexual abuse because she was scared and trapped. She "didn't know what to do" or "who to talk to." She testified that by this point, the sexual abuse occurred less frequently, about once every week or two.

At the age of 18, Doe took defendant's last name because she did not want to have her biological father's last name. Her biological father had not been in her life since before she was three years old.

When Doe started attending a local college, defendant wanted to take her to school every day and did not want to let her drive. He also wanted to pick her up during lunchtime, or take food to her. Even prior to attending college, when Doe, for a period of

8

time, was attending the same closed campus high school as defendant's older stepdaughter, defendant brought food to Doe but occasionally did not bring food to his other stepdaughter.

Doe testified that the last time defendant raped her was in May 2017, when she was 20 years old. The incident occurred at the apartment complex where defendant cleaned apartments. Doe again tried to stop him by holding his chest, but he did not stop.

**D.** *Doe's Disclosure to Her Boyfriend and the Police*

In August 2017, when she was 20 years old, Doe started a dating relationship with a person who taught summer school at a high school. Two months prior to them dating, Doe had invited him to a barbecue at her house, where he met defendant for the first time. Defendant took Doe's soon-to-be boyfriend away from the rest of the people in attendance and threatened him, using "very vile" and "utterly disgusting language -- a lot of cuss words." Doe's boyfriend testified that defendant stated "that he always knows where I'm at. And if something happens, he's gonna come and get me -- something along those lines -- take me down or something like that." Doe's boyfriend testified that he was "pretty worried. It wasn't a normal conversation that you have with a father." He testified that Doe was not even his girlfriend at the time.

In the beginning, when Doe and her soon-to-be boyfriend went to the movies or to eat out, Doe's younger half-sibling, defendant's biological daughter, always had to accompany them. Later, when they were going out on their own, Doe's boyfriend observed that Doe was always checking her text messages and taking pictures of wherever they were, including street intersections, signs, or buildings. It appeared to the boyfriend that defendant was "only focused on [Doe], not even on his real kids," which "really weirded out" the boyfriend. The boyfriend thought defendant was "obsessed" with Doe. The boyfriend was worried and expressed concern to his own mother and grandmother. The boyfriend also felt that defendant was "focused" on the boyfriend, trying to get him to stay away from Doe and not get too close to her. The boyfriend

9

testified that defendant tried to "interrogate" him and "chew [him] out kind of." Defendant's wife likewise testified that defendant acted with hatred, aggression, and rudeness to Doe's boyfriend.

In early September 2017, while at a restaurant, Doe's boyfriend confronted Doe and asked whether defendant had molested her. Doe asked why he thought that, told him it was crazy, and denied it. She was scared and didn't know how to tell her boyfriend or what he would think.

Later, on September 23, 2017, Doe indicated by text message to her boyfriend that defendant had molested her. Prior to the disclosure, her boyfriend had gotten upset with her because defendant would not let her go to a football game. The boyfriend texted her, indicating that he was considering breaking up with her. Doe was in love with him and believed the potential break up was defendant's fault. Doe disclosed that she had been molested although she did not disclose the details because she did not want her boyfriend to see or treat her differently.

The boyfriend testified that his reaction to Doe's disclosure of being molested was anger, frustration, sadness, and "[j]ust every emotion." He told Doe, " 'I'm sorry. I'm done.' " The boyfriend expressed anger and frustration to Doe, including by using curse words.

Doe eventually texted her boyfriend that it wasn't true, and that she was just testing to see if he really loved her. At trial, Doe explained that she retracted her disclosure because she was scared and regretted making the disclosure.

Doe's boyfriend texted back, stating that she was lying, insisting that she report it, and indicating that he couldn't be with her if she continued interacting with defendant. At some point, the boyfriend indicated that he envisioned marrying her in the future but not if defendant was still a part of her family. The boyfriend told her that she "need[ed] to get out of there," and that he was going to help her. Doe was reluctant to report the conduct to the police and wanted to delay reporting, but the boyfriend wanted her to

10

report sooner. Doe knew that if she didn't report it to the police, her boyfriend was going to break up with her.

The next day, on September 24, 2017, Doe and her boyfriend texted "to get a plan to get her out of there." At some point, Doe and her boyfriend decided to engage in a "pretend breakup" for Doe's "safety" so her family "wouldn't know that [her boyfriend was] in her life anymore, helping her get out." Doe told her family, including defendant, that the pair had broken up.

Doe testified that she decided to go to the police because she did not want defendant to control her anymore. She also "finally had people that would support [her] and be with [her] through it," including her boyfriend and a college friend.

On September 27, 2017, a few days after Doe made the text disclosure to her boyfriend, she took a final exam at college, and then her boyfriend and her friend's mother drove her to the police station. Doe turned off her phone location so defendant wouldn't know where she was going. Doe was scared that nothing would change by going to the police and scared of what defendant would do to her, her mother, and her siblings. She also told the police that "she didn't report because she didn't want to split up the family."

While Doe was being interviewed by the police, defendant repeatedly texted her to find out her location. Doe did not respond to him. Defendant texted Doe, "Well, hear this, if I don't get your location within the next five minutes, I'm going to take [my biological daughter's] phone away for a month and I don't give a shit . . . if she needs it at school."

Defendant also texted his biological daughter, who was in class, in an attempt to locate Doe. His texts to his biological daughter included, ". . . I told [Doe] that . . . if she doesn't answer me in five minutes then I'm going to take your phone for a fucking month. It's been 12 minutes. I don't know where the fuck she's at." Defendant further texted his biological daughter, "I'm going to punish you in front of her so she knows I'm

11

not fucking playing games. I hope whatever she's doing is worth it." Defendant later texted, "And . . . you can send [Doe] a message on Instagram so she knows what she's caused. Let her know . . . that you're going to get beat for her." Defendant told his biological daughter that Doe "ha[d] her location off," and that he had called Doe's "school already." Defendant also texted his biological daughter, "[Doe] could have left with [her boyfriend] since he knows I'll go look for her car."

While at the police station, Doe agreed to make a pretext call to defendant. During the call, Doe told defendant that she was pregnant, and that it was his fault because he "didn't . . . use nothing." Defendant replied that Doe was "the one that was frickin' tellin' [him] all the frickin' time, you know, 'I want this today, I want this today, I want this today.' " Defendant later apologized for being a "horrible fuckin' dad," for "being so fuckin' strict," and "for always being fuckin' like possessive, and fuckin' not wanting [her] to fuckin' have fun, and fuckin' go out . . . ." When Doe asked if defendant was going to tell her mother that Doe was pregnant by him, defendant responded that he wanted to see Doe one more time before she talked to her mother.

At trial, Doe denied asking defendant to have sex. She also denied making up the allegations because she was afraid to lose her boyfriend.

After Doe was interviewed at the police station, her boyfriend dropped her off at her friend's house. Defendant was arrested that same day. Defendant's wife filed for divorce that month.

Defendant did not testify at trial. The only witness called by the defense was an investigator for the district attorney's office. The district attorney investigator testified that, prior to trial, when he initially interviewed Doe's grandfather by phone, the grandfather indicated that he was not aware of Doe and defendant being in a locked bedroom. About 10 minutes later, the grandfather called the investigator back and told the investigator about defendant and Doe being in a locked room in his home.

E. *Verdicts and Sentence*

The jury convicted defendant on all counts – six counts of aggravated sexual assault of a child under the age of 14 and seven or more years younger than defendant (§ 269; counts 1-5 & 8), two counts of committing a forcible lewd or lascivious act on a child under the age of 14 years (§ 288, former subd. (b)(1); counts 6 & 7), and four counts of forcible rape of a minor age 14 years or older (§ 261, subd. (a)(2); counts 9-12).[2]

The trial court sentenced defendant to an indeterminate prison term of 90 years to life, consecutive to a determinate term of 48 years. The sentence consists of consecutive terms of 15 years to life on counts 1 through 5 and 8 (§ 269), consecutive nine-year terms for counts 9 through 12 (§ 261, subd. (a)(2)), and consecutive six-year terms for counts 6 and 7[3] (§ 288, former subd. (b)(1)).

## III. DISCUSSION

A. *Admission of Evidence Regarding Defendant Physically Punishing His Biological Daughter*

Defendant contends that the trial court erred by admitting testimony that he physically punished his biological daughter one time by hitting her with a belt. He argues that the testimony was irrelevant, and that any probative value was outweighed by undue prejudice under Evidence Code section 352. In support of this argument, defendant cites his biological daughter's testimony that she had not done anything wrong, and that she did not know why defendant hit her in the presence of Doe. Defendant also argues that

---

[2] The verdict form for count 9, forcible rape of a minor age 14 years or older, indicates that the offense was committed between 2013 and 2014. The abstract of judgment, however, indicates that the offense was committed between 2010 and 2011. We will order the abstract of judgment corrected accordingly.

[3] The abstract of judgment incorrectly indicates that defendant was sentenced to three-year terms for counts 6 and 7. The abstract of judgment also fails to indicate that the sentence for count 7 was the middle term. We will order the abstract of judgment corrected accordingly.

13

the trial court "did not engage in a [section] 352 analysis on the record." We understand defendant to contend that the error requires reversal of his convictions.

### 1. Background

Prior to trial, the prosecutor requested an order allowing evidence of specific acts of anger, threats, or violence by defendant to show duress, menace, and fear with respect to Doe. The prosecutor explained that, as an example, Doe and defendant's biological daughter would testify that during one incident, defendant hit his biological daughter in front of Doe because Doe had not complied with him. Defense counsel argued that the evidence was not relevant, and that it was prejudicial unless it pertained to compliance with "the sexual abuse itself" and occurred while Doe was a minor. The trial court initially ruled that "duress does not have to be tied directly to the sexual conduct, especially for children," but that the acts did need to occur during the relevant timeframe.

At a subsequent pretrial hearing, the parties and the trial court revisited the issue. Defense counsel indicated that defendant's charged conduct allegedly occurred when Doe was a minor and that, to the extent Doe was 18 years old when the punishment incident occurred, the incident was irrelevant to the issue of duress for any of the charges. Further, according to defense counsel, the prosecutor would not be able to show that the punishment incident occurred before Doe turned 18 years old "because of the vagueness" of pretrial statements by Doe and defendant's biological daughter. The prosecutor responded that even if the duress occurred after Doe was 18 years old, the evidence was still relevant regarding why Doe continued to keep defendant's conduct a secret even after she turned 18 years old. The prosecutor argued, "It doesn't happen that someone turns 18 and then all of the sudden the same duress that you were using when she was a minor is no longer relevant to why she's not reporting, why she's not seeking help." The prosecutor further indicated that the incident was part of a pattern of behavior, rather than an isolated incident, by defendant that was relevant to the issue of duress. The court believed that "all of the behavior that we're talking about has to be viewed in the context

14

and not separated out." The court believed the issue was "going to come down to a 352 analysis as to whether or not that incident should be put before the jury" and indicated that it was taking the matter under submission.

At another hearing, the trial court and the parties again addressed the issue. The court indicated that corporal punishment against the biological daughter in general, or corporal punishment for what she had done, would not be relevant. Defense counsel reiterated the argument that, to the extent the punishment incident occurred when Doe was 20 years old and the incident was "not specific to sexual conduct," then the evidence was not relevant and was inflammatory and prejudicial. The prosecutor responded that the incident went to the issues of duress, control, and manipulation by defendant "not just in relation to a specific period of time, but the entire story." The court was provided with pretrial statements by Doe and/or defendant's biological daughter about the incident, which involved defendant questioning Doe about her secret phone while inflicting punishment on his biological daughter. The court believed the incident showed defendant's control over both daughters and "maybe an attempt to manipulate [Doe] though punishing [his biological daughter]." The court stated that it wanted to "think a little more about it, because the origin of the punishment is because of a cell phone." The court indicated that it "shows domination and control" but was "concern[ed]" whether it was "attenuated." The court stated that it was thinking about whether, if the incident involved "control and domination and duress, does it matter that it's not over a sexual issue?"

The next day, Doe testified as the prosecution's first witness. Outside the presence of the jury, the trial court made its ruling regarding admission of the punishment incident. The court stated that Doe and defendant's biological daughter would be allowed to testify "only as to . . . their personal observations." Based on the court's review of pretrial statements by the pair, the court believed the testimony would "be very narrow."

15

Doe proceeded to testify about the incident. When Doe was around 16 or 17 years old, she bought an iPod and used it to communicate with a boy, instead of using the cell phone that her parents had bought her. When defendant found the device, he asked Doe about some of the messages she had sent the boy and what they were talking about. Doe "said nothing." Defendant called his biological daughter into the room and told her that if Doe did not say what she was talking about in the messages, then defendant would hit his biological daughter. Both girls started crying. Defendant proceeded to count down from three to one, and then he hit his biological daughter with a belt because Doe would not answer his questions. Doe "made something up" from the messages in order to get him to stop. Doe explained that she had a "close" relationship with defendant's biological daughter but that after the incident, the biological daughter was upset and stayed away from Doe. This made Doe sad. Doe also felt hurt regarding defendant using his biological daughter against Doe, because Doe loved and wanted to protect her.

Defendant's biological daughter also testified about the incident. She testified that she was 16 years old at the time of the incident, which meant Doe would have been 20 years old. The biological daughter did not know why she was called into the room with Doe. Defendant hit his biological daughter twice on the legs with a leather belt before she went to the floor due to the pain. While she was on the ground grabbing her legs, defendant hit her once on the back. Throughout the incident, she did not say anything to defendant because she was scared of him.

Subsequently, outside the presence of the jury, defense counsel "renew[ed]" the objection to the belt incident. Counsel contended that the biological daughter's testimony was "much more strong in terms of when it happened," which "put [the victim] at approximately 20 years old." Counsel argued that, on balance, the evidence was "far less relevant than it is prejudicial," and that it could not be used to support a duress argument because it did not happen during the timeframe of the charges. The prosecutor responded that the incident was relevant to why Doe between the ages of 18 and 20 years old did not

16

report defendant's crimes and why she "remained in the same home as her perpetrator," and that it showed "the control [defendant] had over her." The trial court stated: "The Court does find that this evidence is relevant and probative as it goes to the relationship and the dynamic as to why this particular witness, [Doe], may or may not have reported or stayed in the home or taken a name or anything else. It shows the relationship dynamics between [defendant] and the complaining witness. So I think that it's probative and relevant and will be allowed."

### 2. Law

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The trial court has discretion to exclude relevant evidence if "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (*Id.*, § 352.) " 'The prejudice that [Evidence Code] section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.]" ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439 (*Doolin*).) " ' " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " (*Ibid.*) Moreover, " '[t]he code speaks in terms of *undue* prejudice. Unless the danger[] of undue prejudice . . . " 'substantially outweigh[s]' " the probative value of relevant evidence, [an Evidence Code] section 352 objection should fail. [Citation.]' " (*Ibid.*) We review a trial court's ruling under Evidence Code section 352 for abuse of discretion. (*Doolin*, *supra*, at p. 437.)

### 3. Analysis

As an initial matter, we observe that defendant's opening brief on appeal omits the evidence that the punishment was being inflicted in order to compel Doe to answer his questions. The omission of this evidence in defendant's brief is significant and

17

improper.  (Cal. Rules of Court, rules 8.204(a)(2)(C) [the "appellant's opening brief must:  [¶]  . . .  [¶]  . . .  [p]rovide a summary of the significant facts"], 8.360(a).)

Turning to the issue of whether the evidence should have been excluded at trial, we determine that the evidence of defendant demanding Doe to answer his questions in order to prevent or stop him from physically punishing his biological daughter showed the dynamics of the relationship between defendant and Doe.  This incident and others showed the extent of duress and control defendant exercised over Doe.  The dynamics of their relationship was probative of whether Doe was under duress during the charged offenses, and why, even into adulthood, she continued to reside with him, allowed him to monitor and control her movements, and delayed reporting his sexual assaults.  The trial court did not abuse its discretion by impliedly finding that the probative value was not substantially outweighed by a danger of undue prejudice.  (Evid. Code, § 352.)  Although defendant's physical punishment of his biological daughter due to Doe's refusal to answer his questions was "unpleasant, it paled in comparison to the testimony" about his repeated sexual assaults of Doe as a minor.  (*Doolin*, *supra*, 45 Cal.4th at p. 439.)  The jury was instructed to impartially consider all the evidence, to follow the law, and to not be influenced by sympathy or prejudice.   (See *ibid.*)  On this record, we find no abuse of discretion in admitting evidence of the incident.

Regarding defendant's contention that the trial court "did not engage in a 352 analysis on the record," the California Supreme Court has stated that "when ruling on . . . [an Evidence Code] section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state it has done so.  All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 213 (*Williams*).)  In this case, the trial court heard argument from the parties at multiple hearings regarding whether the evidence should be admitted or whether it should be excluded as unduly prejudicial.  The court during one of the hearings expressly stated that

18

the issue was "going to come down to a 352 analysis as to whether or not that incident should be put before the jury." We determine that "the record demonstrate[s] the trial court understood and fulfilled its responsibilities under Evidence Code section 352." (*Williams*, *supra*, at p. 213.)

**B.** *Admission of Pretext Call*

Defendant contends that the trial court erred by admitting his statements from the pretext call with Doe. We understand defendant to contend that his statements should have been excluded as hearsay because he did not make any admissions during the call. We also understand defendant to contend that one of his statements during the call should have been excluded as irrelevant and prejudicial based on the "language and the tone" of his statement. We understand defendant to contend that the error in admitting the call requires reversal of his convictions.

### 1. Background

Prior to trial, the parties and the trial court discussed the pretext call during several hearings. The prosecutor contended that statements in the pretext call were relevant to the case and should be admitted. Defense counsel objected on the grounds that there were no admissions by defendant in the call, and that therefore the call was irrelevant and prejudicial. The prosecutor responded that an exception to the hearsay rule applied to statements of a party opponent under Evidence Code section 1220, and that pursuant to *People v. Rodriguez* (2014) 58 Cal.4th 587, at page 637 (*Rodriguez*), the statements did not need to be admissions in order to qualify as an exception to the hearsay rule. The court observed that there were statements in the call that were relevant to show duress, control, and power over Doe, including whether their sexual contact as adults was consensual, and indicated that it weighed the probative value and potential prejudice. The court ultimately ruled that the call would be admitted into evidence.

An audio recording of the call[4] was played for the jury, and the recording was admitted into evidence. Throughout the approximately 15-minute call, defendant repeatedly asks Doe where she is and indicates that he wants to talk to her in person. He also asks why she did not answer her phone all day and tells her to turn on her location. When Doe states that she has been at school, defendant indicates that he called the college and determined that she was not there. Defendant indicates that he is on his way to the school, and he later states that he is in the parking lot.

During the call, Doe tells defendant that she is pregnant. Defendant asks whether she is kidding. Later in the call, when Doe tells defendant that he knows what he did to her, defendant asks what she is talking about. Doe eventually indicates that she's going to tell her mother about the pregnancy. Defendant responds that Doe cannot do that. Doe states that it is defendant's fault because he "didn't . . . use nothing." Defendant replies that Doe was "the one that was frickin' tellin' [him] all the frickin' time, you know, 'I want this today, I want this today, I want this today.' " Doe asks defendant about the time when she was younger. Defendant asks Doe, "What are you talking about?" When Doe questions why defendant is acting like he does not know, defendant responds that it sounds like Doe is trying to get him to say something. Defendant later asks or suggests that Doe is with her boyfriend or at the police department. Doe asks whether defendant is going to apologize for what he did to her. Defendant apologizes for "everything" and promises to change. Doe tells defendant that he ruined her life since she was 11 years old. Defendant responds that he does not know what that means. Defendant later apologizes for being a "horrible fuckin' dad," for "being so fuckin' strict," and "for always being fuckin' like possessive, and fuckin' not wanting [her] to fuckin' have fun,

[4] The parties refer to a pretext "call." The audio recording admitted at trial actually contains two calls. The first call ends after approximately four minutes apparently due to a bad connection. Defendant and Doe resume their conversation in the second call. Similar to the parties, we refer to the entirety of the recording as one call.

and fuckin' go out . . . ." When Doe asks if defendant is going to tell her mother that Doe is pregnant from him, defendant responds that he wants to see Doe one more time before she talks to her mother.

## 2. Law

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay evidence is generally inadmissible. (*Id.*, § 1200, subd. (b).) However, "Evidence Code section 1220[5] makes a 'statement' of a party an exception to the general rule forbidding hearsay evidence when the statement is offered against that party." (*Rodriguez, supra*, 58 Cal.4th at p. 637.) "The exception to the hearsay rule for statements of a party is sometimes referred to as the exception for *admissions* of a party. However, Evidence Code section 1220 covers all *statements* of a party, whether or not they might otherwise be characterized as admissions. [Citations.]" (*People v. Horning* (2004) 34 Cal.4th 871, 898, fn. 5.)

As we set forth above, the trial court has discretion to exclude relevant evidence if "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.) However, " '[t]he prejudice that [Evidence Code] section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.]" ' " (*Doolin, supra*, 45 Cal.4th at p. 439.) Moreover, " '[t]he code speaks in terms of *undue* prejudice. Unless the danger[] of undue prejudice . . . " 'substantially outweigh[s]' " the probative value of relevant evidence, [an Evidence Code] section 352 objection should fail. [Citation.]' " (*Ibid.*)

---

[5] Evidence Code section 1220 states: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

### 3. Analysis

First, we understand defendant to contend that his statements during the pretext call should have been excluded as hearsay because he did not make any admissions during the call.

Defendant's argument that "nothing . . . could be considered an 'admission' " during the pretext call "is irrelevant.  Although Evidence Code section 1220's exception to the hearsay rule is sometimes referred to as an exception for admissions, the exception is not so limited.  [Citation.]  Instead, the exception applies to all statements of the party against whom they are offered.  Here, [the pretext call] consisted of statements, defendant made the statements, the statements were offered against [him], and [he] was a party to this action.  Thus, the statements came within an exception to the hearsay rule.  [Citation.]  They were admissible against defendant." (*Rodriguez*, *supra*, 58 Cal.4th at p. 637.)[6]

Second, we understand defendant to contend that the trial court erred in admitting the following statement that he made to Doe in the pretext call:  "I fucking called over there, and you weren't fucking there."  We understand defendant to contend that the "language and the tone was irrelevant and prejudicial while providing no evidentiary value for the jury regarding the relevant issues at hand."

The trial court determined generally that the pretext call was relevant to show duress, control, and power over Doe.  The court indicated that it was "not sure" how to parse certain matters out of the call.  The court found that "maybe in another type of case [the statement] wouldn't be relevant, but this case has nuances and issues that kind of ebb and flow, and . . . this is relevant for the jury to hear and understand the dynamic between . . . Doe and [defendant]."

---

[6] Regarding Doe's statements in the pretext call, the jury was instructed that her statements were "not admissible for the truth but for the limited purpose of providing context for [defendant's] statements."

Defendant made the statement, "I fucking called over there, and you weren't fucking there," in response to Doe's assertion that she had been at school that day.  The statement was probative of the control that defendant sought to exercise over Doe, even though she was over 18 years old and attending college.  Defendant's accusation that she was not at school where he expected her to be, and that he had called the school to locate her, was probative of the level of his control.  The statement was made during a conversation in which defendant repeatedly sought to speak to Doe in person, told her to turn on her phone location, and indicated that he had traveled to school during the conversation to find her.  That defendant sought to exercise this amount of control when Doe was over 18 years old was probative of the level of control that he had over her when she was under 18 years old during the time of the charged offenses, as well as her continued failure to report the sexual abuse.  The language and tone of defendant in making the statement also conveyed the seriousness of his expectations to Doe.  In this regard, we observe that " '[t]he prejudice that [Evidence Code] section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.]" ' " (*Doolin*, *supra*, 45 Cal.4th at p. 439.)  We determine that the trial court did not abuse its discretion in determining that any potential prejudicial effect of defendant's statement did not substantially outweigh the statement's probative value.  (See Evid. Code, § 352.)

### C. *Admission of CSAAS Evidence*

A clinical psychologist testified for the prosecution as an expert in CSAAS.  Defendant contends that, "[c]onsidering the record of evidence and the relevant case law, the court erred in admitting CSAAS evidence such that the verdicts should be reversed."

In making this contention, defendant fails to (1) recite what CSAAS evidence was admitted at trial, (2) identify, with a record citation, what objection he made below to the evidence, (3) identify, with a record citation, the portion(s) to which he now claims should not have been admitted, and (4) explain why those portions should not have been

23

admitted.  (See Cal. Rules of Court, rules 8.204(a)(1)(C) [appellate brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"]; 8.360(a)].)

As defendant acknowledges, California courts have held that CSAAS evidence is admissible to disabuse jurors of commonly held misconceptions about child sexual abuse. (See, e.g., *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503**;** *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (*Patino*); *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1383-1384.)  To the extent there are limitations on the admission, or use, of CSAAS evidence, defendant fails to articulate why or how the evidence admitted by the court in this case (including with supporting record citations) violated those limitations.  (See, e.g., *Patino*, *supra*, at p. 1745 [CSAAS "testimony is pertinent and admissible if an issue has been raised as to the victim's credibility"; admission of CSAAS evidence "is not error merely because it was introduced as part of the prosecution's case-in-chief"].)  We conclude that defendant has forfeited any objection to the CSAAS evidence.  (See *People v. Guzman* (2019) 8 Cal.5th 673, 683, fn. 7 [defendant's failure to develop argument on appeal results in forfeiture of claim]; *People v. Stanley* (1995) 10 Cal.4th 764, 793 [it is not the court's role on appeal to develop the defendant's argument].)

**D.** *Admission of Testimony Regarding Doe's Boyfriend's Fear of Defendant*

Defendant contends that the trial court erred by admitting the boyfriend's testimony that he was concerned that he or his family would be hurt by defendant. Defendant argues that the testimony was "irrelevant for the jury to consider in deciding guilt," and that the testimony was unduly prejudicial under Evidence Code section 352 because it "serve[d] only to paint the defendant in a negative light."  We understand defendant to contend that the error requires reversal of his convictions.

### 1. Background

During the prosecution's case-in-chief, Doe's boyfriend testified about an exchange of texts with Doe on September 23, 2017, a few days prior to Doe going to the police. The boyfriend testified that his reaction during the text exchange included anger, frustration, sadness, and "[j]ust every emotion." He explained that he was angry and frustrated because he cared about Doe and did not want her to have to go through "those kind of things," in reference to Doe being molested. The boyfriend also testified that he had concerns relating to defendant. The prosecutor asked, "Did you have any concerns related to the defendant that didn't have anything to do with [Doe]?" The boyfriend responded, "Yes." The prosecutor then asked, "And what were those concerns?" Defense counsel objected on the grounds of relevance, foundation, and speculation. The prosecutor asked to approach the bench. After an unreported sidebar discussion, the trial court stated that the prosecutor could ask the question. The prosecutor asked the boyfriend whether he "ha[d] any concerns about [himself] as it related to the defendant." The boyfriend responded affirmatively and indicated that he was concerned that defendant would hurt him (the boyfriend) or his family.

Later, outside the presence of the jury, the issue was addressed on the record. The trial court stated that the boyfriend was asked regarding "his concerns about [defendant] having nothing to do with [Doe]." The court stated that "[t]he objection was relevance and foundation." Defense counsel explained, "I don't believe that [the boyfriend's] concerns are relevant to this case. I think that they are prejudicial. And I think that they should have been excluded." The prosecutor responded, "[T]hey are relevant because they explain the witness's frustration, anger, using curse words, things to that effect, in his text message with [Doe]. [¶] . . . I think an argument can be made both ways in terms of why the witness was so frustrated. And I think that it is important for the jurors to know that he had concerns for himself as well as it relates to continuing this relationship, which is going to come in when these text messages are run over." The court stated:

25

"The Court ruled that they would be relevant given the totality of what would be covered, both on direct and cross. So the Court did allow it in. The defense objections are preserved for the record."

## 2. Law

As we have stated above, evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Relevant evidence is admissible. (*Id.*, § 350.) However, the trial court has discretion to exclude relevant evidence if "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (*Id.*, § 352.)

## 3. Analysis

Defendant contends that the boyfriend's testimony about being concerned that he or his family would be hurt by defendant should have been excluded as irrelevant or unduly prejudicial. As an initial matter, it is not clear that a timely objection was made on the ground of undue prejudice under Evidence Code section 352. When the prosecutor posed the question to the witness, defense counsel raised a relevance objection but did not object on the ground of undue prejudice before an unreported sidebar was held. When the trial court and the parties later put the issue on the record, the court referred to the relevance objection and stated its ruling regarding relevance. Defense counsel in explaining the objection at that point, after the evidence had already been admitted, briefly referred to the testimony being "prejudicial." (See *People v. Mills* (2010) 48 Cal.4th 158, 194 [objection that evidence was impermissibly prejudicial under Evidence Code section 352 was forfeited on appeal where sole objection below was based on relevance].

Assuming a timely objection was made on the ground of undue prejudice in addition to relevance, we determine that the trial court did not abuse its discretion in admitting the testimony. As the prosecutor contended below, the boyfriend's frustration

26

and anger, including his use of curse words during the text exchange, could be argued "both ways in terms of why the witness was so frustrated." Allowing the prosecutor to put on evidence that some of the boyfriend's negative reaction was directed at defendant, not at Doe, explained the boyfriend's statements during the text exchange with Doe, including why he had concerns about continuing their relationship, and also tended to rebut the argument that Doe somehow felt pressured to make false accusations against defendant because her boyfriend was angry or frustrated with her, rather than defendant. Whether Doe's disclosure of molestation to her boyfriend during the text exchange, and later disclosure to the police, were false disclosures resulting from pressure from the boyfriend and Doe's effort to hold on to their relationship were contested issues at trial. Further, the potential prejudicial effect of the boyfriend's testimony expressing concern that defendant would hurt him or his family did not substantially outweigh the evidence's probative value. The boyfriend's testimony was very brief and did not go into detail.

Even assuming the trial court erred in admitting the evidence, defendant fails to articulate a basis for reversing the judgment. "It is also well settled that the erroneous admission . . . of evidence does not require reversal except where the error or errors caused a miscarriage of justice. (Evid. Code, §[] 353, subd. (b) . . . .) '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1001 (*Richardson*).)

Defendant acknowledges that a "miscarriage of justice" must be shown in order to set aside a verdict or reverse a judgment due to the erroneous admission of evidence. (Evid. Code, § 353, subd. (b); see *Richardson*, *supra*, 43 Cal.4th at p. 1001.) Defendant fails, however, to offer any argument as to why the admission of the boyfriend's testimony resulted in a miscarriage of justice in this case.

27

We determine that it is not reasonably probable that the jury would have reached a different verdict if the boyfriend's concern about himself or his family being harmed by defendant had been excluded. There was already ample evidence from which the jury would have necessarily concluded that defendant instilled fear in those around him, including fear by the boyfriend. Doe and defendant's biological daughter both testified that defendant was scary when he got mad, and that he threw items, including picture frames, a copy machine, and a television. Defendant's wife similarly testified that defendant would throw "[w]hatever he had next to him or hit the walls or hit something." Defendant's wife also testified that defendant threatened a high school boy who came to visit Doe, and that the boy never returned. Doe's boyfriend testified to a similar incident before he started dating Doe when he first met defendant. Defendant threatened him, using "very vile" and "utterly disgusting language -- a lot of cuss words." The boyfriend testified that defendant stated "that he always knows where I'm at. And if something happens, he's gonna come and get me -- something along those lines -- take me down or something like that." Doe's boyfriend testified that he was "pretty worried" as a result of the conversation.

Moreover, the evidence supporting the charged offenses was compelling. Doe's testimony of sexual abuse, beginning at age 11, was unrebutted. There was also ample evidence regarding defendant's apparent obsessive focus on her and the extreme level of control he exercised over her as contrasted with his relationship with other family members.

On this record, it is not reasonably probable that defendant would have obtained a more favorable result if the boyfriend's testimony – regarding his concern that he or his family would be hurt by defendant – had been excluded.

28

## IV.  DISPOSITION

The judgment is affirmed.

The abstract of judgment regarding defendant's determinate term (Judicial Council form CR-290) is ordered corrected to state:

(1) for count 6 (forcible lewd act), defendant was sentenced to the middle term of six years;

(2) for count 7 (forcible lewd act), defendant was sentenced to the middle term of six years; and

(3) for count 9 (forcible rape), the offense was committed between 2013 and 2014.

The trial court is directed to send a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

_____

BAMATTRE-MANOUKIAN, J.



WE CONCUR:




_____

ELIA, ACTING P.J.




_____

GROVER, J.




*People v. Argumedo*
**H047538**