[Crim. No. 9078.   Second Dist., Div. Three.   June 17, 1964.]

THE PEOPLE, Plaintiff and Appellant, v. CHARLEY ORVIL MANSELL, Defendant and Respondent.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, William B. McKesson, District Attorney, Harry Wood and Robert J. Lord, Deputy District Attorneys, for Plaintiff and Appellant.

Barsam & LeVeque and Thomas B. Barsam for Defendant and Respondent.

FILES, J.—In this prosecution for violation of Penal Code, section 288, a preliminary examination was held before a judge pro tempore, who ordered the defendant held to answer as to two alleged offenses. When the case came before the superior court, a motion made under Penal Code, section 995, was granted and the information was set aside. The court stated, "I don't think this transcript indicates sufficient evidence to hold this fellow for trial."

The district attorney has appealed.

The first count in the information alleges an offense against a girl named Debbie, who was 7 years of age at the time of the preliminary examination, July 2, 1962.

Debbie testified that she knew defendant as "Charley," and at the time referred to he lived in an apartment in the same building in which she lived. She had two sisters, Katie and Robbin. Debbie and Katie played with Charley "in the sand" "under the porch." What was meant by "under the porch" is not clearly established, but from other testimony it would appear that the porch referred to was the second story porch, reached by an outside stairway. Further testimony by Debbie on direct examination: "Q. Did you and Katie ever sit on Charley's lap? A. Yes. Q. How would both of you sit on his lap? A. Straddled. Q. Both his legs or one leg; how did you sit? A. One. Q. Each one of you on one leg? A. Yes. Q. And did Charley ever touch you while you were straddle*d* his legs? A. Yes. Q. Where did he touch you? A. He put his hand under my shorts and in between my legs when I was in the cabin, and the other one was when I was under the porch. ... Q. When Charley put his hand under your shorts, did he touch you? A. Yes. Q. And where did he touch you? A. I don't know. Q. Did he touch your legs? A. Yes. Q. Did he touch any other part of you? A. No. Q. What part of your legs did he touch? A. Under my shorts. Q. Was that close to your body? A. No. Q. Where abouts was it did he touch you? A. Right at the end. Q. At the end of your leg? A. (Witness nods head affirmatively.) Q. Is that where your foot is? A. No. Q. It is the other end of your leg; is that right? A. Yes. Q. Now, this time that you were under the porch with your sister sitting on Charley's, straddled Charley's legs, how long did he touch you under your shorts? A. Right at the end of them. Q. Well, how long, Debbie? A. I don't know. Q. Were his fingers still when he put his hand under there or did they move? A. He moved his fingers. Q. Were his fingers touching you when he moved them? A. Yes. Q. This happened at any other time than besides when you were under the porch? A. No. . . . The Court: And you say he touched your body, some part of your body? The Witness: Right at the end of my shorts. The Court: Right at the end of your shorts. Do you know what part of your body you use when you go to the bathroom to make water; was that the part of the body that he touched? A. (Witness shakes head negatively.) The Court: He didn't touch that. Well, you said

something about he touched you between the legs; what did you mean by that? THE WITNESS: Right in between them. THE COURT: Right where the two legs come together; is that what you mean? THE WITNESS: Yes."

On cross-examination Debbie said that by "shorts" she meant outside pants or shorts, not underpanties.

Further cross-examination of Debbie: "Q. All right. Now, when you are talking about the end of the shorts, do your shorts come down to about your knees; is that, or were they longer than that? A. (Witness shakes head negatively.) Q. How long? A. They were shorter. ... Q. Well, how far were they from your knee? A. I don't know. Q. A couple of inches, maybe? A. Yes. Q. Now, the part that Charley touched, was it down at that end of the shorts? Is that where Charley touched you? A. I don't know. Q. Well, you say it was at the end of your shorts; was it down closer to your knee? A. Yes. Q. And was he just patting you down closer to your knee; is that what he was doing? A. I don't know. Q. Was he bouncing you up and down on his knee, too? A. Yes. ... Q. Now, Debbie, was this outside where everybody could see? A. Yes."

Debbie could not remember when this had occurred except that it was during the past school semester.

Debbie's mother testified that Debbie had made a complaint to her concerning this occurrence, but she could not remember the date. When pressed, she said she thought it was the early part of April 1962.

The second count of the information pertains to a 6-year-old girl named Denzel, who lived two houses away from Charley. Denzel testified that she had played with Charley one time only. She sat on his lap, "Facing him. But sideways." Both of her legs were together, but on the side. He touched her with one hand, between the legs. She was wearing jeans, and the hand was on top of the jeans.

She testified: "Q. Just exactly where did he touch you between your legs? A. On the side of them. Q. Was it the inside or the outside? A. Outside. Q. On the outside of your legs? A. Yes. Q. This is outside the legs of your jeans; is that what you mean? A. Yes. Q. Or what do you mean, Denzel? A. On the outside of my jeans. Q. And where abouts on your legs did he touch you; what part of your leg did he touch? A. On the side over here. Q. Where is that? Denzel, you know where you make water? A. Yes. Q. Did he touch you near there? A. Yes. Q. Did he touch you there? A. No. Q. Just near there? A. Yes. Q. Were his fingers moving or were they

still? A. They were still. Q. How long did he touch you? A. For just a minute." Debbie and Debbie's sister "Kathie" were also present. This occurred "outside the building" and "by the steps." The court then questioned Denzel. "THE COURT: Now, can you point to some part of your body, you say that Charley touched with his hand? THE WITNESS: Between my legs. THE COURT: Can you stand up there so I can see. You want to come over, counsel. MR. BARSAM: Yes. THE COURT: Now, you point so we can see what he did. I can't see your hand. Your clothes are in the way. I see, just like that, and he moved his hand, did he? THE WITNESS: Yes."

Denzel's mother testified: "Q. BY MR. SPERRY: Now, did Denzel make a complaint to you concerning what she has testified to? A. Not her directly; one of the neighbors came— MR. BARSAM: I object as not being responsive. THE COURT: You listen to the question. THE WITNESS: Well, the— THE COURT: The answer would be no. THE WITNESS: No. She did later after I got ahold of her." This witness could not remember when this had happened. She believed it was in May 1962. She remembered that after she questioned her daughter, she called the police.

The only other witness was a neighbor, Mrs. Svetlik, who testified that she had seen defendant in the presence of Debbie just once. When asked for the date, she said, "I don't remember. That was, I think it was April, April or June, the last of April or beginning of June, somewhere in there—I mean May." She testified defendant was sitting on his porch, which is on the first floor right next to the stairs leading to the second floor. Debbie's sister Robbin was there, and both girls were sitting on defendant's lap, each straddling a knee, both facing away from him. She then testified: "Q. What did you observe, please? A. He had his hand between their, between their legs, both of them. Q. Was his hand on the outside or the inside of the clothing? A. Outside. Q. What type of clothing did they have on? A. Shorts. Q. Was he touching them? A. Well, on the outside of their clothes, but his hands was in between their legs. Q. What areas of their body, if any, was he touching? A. Between his legs—their legs in—. Q. Was he touching only their legs or was he touching their body? A. No, he was touching their body, too. Q. And how long did you observe this? A. Just for a minute. Q. Which direction was the defendant looking? A. Well, towards me. I came out of the door to hang out some clothes; and my staircase is right in front of our door; and I

walked around the staircase, and he was there; and I walked just about to the second apartment house, and he saw me, and he stopped, you know; he stopped and moved his hands from the leg when I seen him.''

The information alleges that the offense against Debbie occurred on or about April 17, and the offense against Denzel occurred on or about April 20, 1962. If the district attorney had any basis for inserting these dates in the information, he did not put it in the record.

The district attorney argues that the order dismissing the information should be reversed, relying upon the well established doctrines (1) that the superior court, in deciding a motion under Penal Code, section 995, may not reweigh the evidence (*Perry* v. *Superior Court,* 57 Cal.2d 276, 283 [19 Cal.Rptr. 1, 368 P.2d 529]; *De Mond* v. *Superior Court,* 57 Cal.2d 340, 344 [19 Cal.Rptr. 313, 368 P.2d 865]; *People* v. *Perry,* 216 Cal.App.2d 8, 10 [30 Cal.Rptr. 788]); (2) determination of a child's competency and the weight to be given his testimony are for the magistrate who is the trier of the fact (*People* v. *Burton,* 55 Cal.2d 328, 341 [11 Cal.Rptr. 65, 359 P.2d 433]); and (3) that the specific intent essential to a conviction for violation of Penal Code, section 288, may be inferred from the circumstances (*People* v. *Jones,* 42 Cal. 2d 219, 223 [266 P.2d 38]; *People* v. *Clutter,* 133 Cal.App.2d 691 [284 P.2d 918]; *People* v. *McCurdy,* 60 Cal.App. 499, 502 [213 P.59]).

Sufficient cause to hold a defendant to answer is commonly said to be "such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused.'' (*Rogers* v. *Superior Court,* 46 Cal.2d 3, 7 [291 P.2d 929], quoted in *Perry* v. *Superior Court, supra,* at p. 283.) It is sometimes said that "An indictment [or information] will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.'' (*Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 183 [281 P.2d 250], quoted in *De Mond* v. *Superior Court, supra,* at p. 344.) These statements emphasize that the magistrate at the preliminary hearing need not be convinced beyond a reasonable doubt. Nevertheless, in each of the cases discussing the sufficiency of the evidence before the magistrate, the Supreme Court has carefully analyzed the evidence produced, and has ascertained that there is some competent evidence as to each

of the elements of the offense, before deciding that the defendant was properly held to answer. ■ Even though the words "suspicion" and "possibility" are used in the statement of the rule, the requisite "suspicion" or "possibility" must be a rational one, based upon evidence in the record. No case has been cited where the evidence before the magistrate was held to be sufficient without its including some competent showing as to each of the elements of the alleged offense.

■ A violation of Penal Code, section 288, is not established unless there is proof of a specific intent of arousing, appealing to or gratifying the lust or passions or sexual desires of the defendant or of the child. (*People* v. *Jones, supra,* at p. 223.) The prosecution's theory here appears to be that defendant was fondling the private parts, or something close to that area of the body, and that a lewd intent may be inferred from what he did. The confused, contradictory and fragmentary descriptions given by the children indicate at most that on two occasions, in public view, defendant held the girls on his knee and in the course of this he put his hand at or near the area of suspicion. According to Debbie, he put his hand under her shorts, not close to her body, "right at the end of my shorts." He did not touch the part she uses when she goes to the bathroom to make water. When Debbie said defendant touched her "right at the end," the prosecutor followed with "At the end of your leg?" to which she nodded affirmatively. The prosecutor apparently took this to refer to her anatomy, as appears from the succeeding questions. But Debbie was talking about the end of the leg of her shorts, as her other answers demonstrate. When the prosecutor next asked, "how long did he touch you under your shorts," she said, "Right at the end of them." This last statement was not an answer to the pending question, but a clarification of her previous answers which the prosecutor had misinterpreted.

It should be recalled that at the time of this touching, Debbie was straddling one of defendant's knees and Katie was straddling the other. An inconsistency was elicited by the judge pro tempore with a leading question: "THE COURT: Right where the two legs come together; is that what you mean? THE WITNESS: Yes." This answer is a better indication of the pliability of the witness than of the guilt of the defendant.

The testimony of the adult witness, Mrs. Svetlik, adds less

848

than nothing to the case. If she witnessed the same occurrence (her guess as to the date was a month off and she saw Robbin, not Katie, on the other knee), all she saw was that the defendant had the girls on his knees, facing away from him, that he had his hands between their legs, outside their clothing, and then he took his hands away. What she saw occurred on an open porch. Doubtless this witness thought something serious had occurred (she was the one who went to Denzel's mother), but her testimony describes nothing which would distinguish defendant's conduct from the most innocent play with neighbor children.

' In the incident with Denzel, the girl was wearing jeans. The hand was on top of the jeans, outside the legs, near where she made water, but not there, and Debbie and Katie were present. On direct examination Denzel said that when defendant touched her, his fingers were still. When the judge asked his leading question, ''and he moved his hand, did he?'' the witness answered, ''Yes.'' Unquestionably the defendant moved his hand at some time, but no inference of a lewd movement can be drawn from the answer to so indefinite a question.

No case has been cited wherein an inference of lewd intent was drawn from circumstances remotely similar to those in this record. ▓▓▓ Inevitably some friendly but incautious adults will bounce little children on their knees, and necessarily the adults will touch the legs of the children in the process, and some other adults will assume the worst. But such commonplace behavior is not enough to support an inference of an intent to commit the atrocious crime described in Penal Code, section 288.

The order is affirmed.

Shinn, P. J., and Ford, J., concurred.