Filed 11/4/24  P. v. Bravo CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E082678 |
| v. | (Super.Ct.No. INF1900129) |
| ARTURO TRUJILLO BRAVO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Gary Polk, Judge.

Affirmed.

Kristen Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Arturo Trujillo Bravo worked as a maintenance man at an apartment complex in Mecca in 2018. Bravo touched Jane Doe, who lived in the apartment complex, on her vagina and buttocks while she was outside playing. He gave her five dollars and told her not to tell anyone. Several months later, he kissed and hugged another girl who lived in the apartment complex, Mary Doe. Defendant was convicted of three counts of committing lewd acts against children under the age of 14 pursuant to Penal Code section 288, subdivision (a).[1]

Defendant claims on appeal that his convictions for committing lewd acts against Jane Doe and Mary Doe were not supported by substantial evidence.

## FACTUAL AND PROCEDURAL HISTORY

A.      PROCEDURAL HISTORY

Defendant was convicted of two counts of willfully, unlawfully, and lewdly committing lewd acts upon the body of Jane Doe (counts 1 & 2), a child under the age of 14; and one count as to Mary Doe (count 3), a child under the age of 14, within the meaning of section 288, subdivision (a). He was additionally found guilty of the misdemeanor offense of annoying and molesting Mary Doe within the meaning of section 647.6, subdivision (a). The jury found true the special allegation that defendant committed a qualifying sexual offense against more than one victim pursuant to section 667.61, subdivision (e)(4) Defendant was sentenced to the indeterminate term of 15 years to life in state prison.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

## B. FACTUAL BACKGROUND

### 1. *PROSECUTION CASE-IN-CHIEF*

#### a. Jane Doe

Jane Doe was 13 years old at the time of trial. In March 2018, when she was nine years old, she lived in an apartment in Mecca with her mother, her stepfather, and two siblings. On March 13, 2018, at around 7:00 p.m., Jane was outside playing in front of her apartment. She was doing cartwheels and a man she knew as Arturo, later identified as defendant, came out and told her to do more cartwheels. She had previously seen defendant at the apartment complex performing maintenance. Defendant went behind some cars and called Jane over to him. It was dark near the cars. Defendant squeezed her butt with his hands approximately five times. This made her very uncomfortable. He then touched her vagina over her clothes. She was "disgusted."[2] Jane "yelled" at him to stop and pushed him off of her. She also kicked him. Defendant also tried to kiss her on the lips. After he grabbed her, he put a five-dollar bill in her hand and told her to be quiet. Defendant got on his bike and left.

Jane ran to her apartment and told her stepfather and mother that the "landlord" touched her. She also stated that the man who touched her watered the plants and lived across from them. Jane was embarrassed and was crying. She described the man. Jane's mother realized it was defendant but did not know his name. She went outside to find him but did not see him anywhere. She eventually confronted defendant who said his

---

[2] On cross-examination, Jane stated that defendant touched her vagina first.

name was Arturo. Jane gave the five-dollar bill to her mother. Jane's mother called the police.

Jane's mother took Jane to talk to a woman named Denise about what had happened to her. Jane told Denise that she had been touched by a man. She also spoke with a nurse at the hospital that night about being touched. Jane told the nurse she had some pain in her vaginal area. Jane told Denise that she knew defendant was "bad" when she first met him.

Jane's mother spoke with a sheriff's deputy who came to the apartment. She told the deputy that the person who touched Jane was named Arturo and lived in apartment No. 3. Officers also came to her work and showed her photographs. She identified defendant from the photographs.

Jane could not identify defendant in court. Jane and her family moved out of the Mecca apartments after the incident. Jane saw defendant one more time before they moved out. Jane knew Mary but they were not close friends. Jane's mother could not identify defendant in court. Jane's mother did not recall speaking with other parents at the apartment complex warning them about defendant.

   b.  <u>Mary Doe</u>

Mary Doe was 13 years old at the time of trial. When she was nine years old, she lived in the same apartment complex as Jane in Mecca. Mary lived with her two brothers, her mother, and her father.

One day in 2018, she was helping her mother clean out their car. She walked back toward her apartment to get a trash bag. As she was just to her apartment, defendant

4

"came out randomly" and hugged her and gave her a kiss on the cheek. He ran his hand down her arm from the shoulder to the elbow. He called her by her name; she had never told him her name. She had previously seen him fix and clean things at the apartment complex. Defendant left. She got scared, and dropped the items she had in her hand. She started crying.

Mary's brother came out of the apartment and saw that Mary was upset and crying. She told him that the man who did maintenance around the apartment had hugged and kissed her. To her brother, Mary appeared to be scared. They went inside and Mary's brother told Mary's father that the maintenance man had kissed Mary. Mary's father observed that Mary was crying.

Mary's father knew defendant was the maintenance man and had spoken with him a couple of times. He had previously been in their apartment to fix things. Mary's father confronted defendant. Defendant immediately told him, " 'No dude, the girl got scared.' " Mary's father told defendant that he was already "know[n] for that." Defendant responded, "I know," and never denied touching Mary. Mary's father cursed at defendant but they were not yelling.

Mary told her mother that defendant had hugged and kissed her. Mary appeared scared. Several days later, Mary's parents took Mary to speak with a woman. Law enforcement came to their apartment and showed them photographs. Mary's father identified defendant from the photographs. Mary's father identified defendant in court as being the man who hugged and kissed Mary.

5

Mary was not friends with Jane. She saw defendant several times around the apartment complex after this incident but she tried to avoid him. Mary's mother spoke with Jane's mother about two months prior to the incident happening with Mary and defendant. She told Mary's mother about defendant touching Jane. Mary's mother had told Mary to be careful around defendant.

### c.  Investigation

Riverside County Sheriff's Deputy Gustavo Cervantes responded to the apartment complex in Mecca on March 13, 2018, regarding the incident involving Jane. Jane's mother told Deputy Cervantes that Jane was playing outside. She went to go get her two other children while Jane played in front of their apartment. When Jane's mother returned, Jane was crying. Jane told her that defendant tried to hug and kiss her. She fought to get away. During the struggle, defendant grabbed her vaginal area over her clothes causing severe pain to her vagina. Defendant gave Jane five dollars and told her not to say anything to anyone about the incident. Jane pointed out apartment No. 3 to Deputy Cervantes and Jane's mother indicated that defendant lived in that apartment. A crumpled five-dollar bill was found outside of Jane's apartment.

Riverside County District Attorney Investigator Edward Ortega was previously a deputy sheriff at the Riverside County Sheriff's Department. While he was a sheriff's deputy, he was the lead investigator for the case involving Mary and Jane. He observed a forensic interview of Jane that was conducted by Denise Bowman.

6

Bowman spoke with Jane on March 14, 2018. The interview was videotaped and shown to the jury.[3] Jane stated that she was nine years old and was in the third grade. Jane was asked why she was at the interview and she responded she had a "problem." Jane was playing in the grass doing gymnastics at her apartment. While she was playing, a man who cleans at the apartment complex saw her. He told her to do more cartwheels. He "grabbed" her "private part" and her buttocks after she finished the cartwheel but she said no. He touched her over her clothes. He got on his bicycle and went "behind the car."

Jane went and told her mother. Her mother told her if he did it again she was going to call the police. After this, Jane stated that he called her over to the area by the car and he touched her buttocks and vagina again behind the car. He touched her over her clothes. Jane kicked him and said no. She started crying. He tried to give her five dollars before he grabbed her private area the second time but she refused. He left the five-dollar bill by their apartment front door. Her mother called the police. Jane said the man's name was Arturo.

Jane was also examined by a forensic nurse on March 13, 2018. Jane told the nurse that a man had touched her on her "front and back parts" on the outside of her clothes while she was outside doing cartwheels. He offered her five dollars the "second time." Jane told the nurse that it hurt "down there." When the nurse touched the outside of her vagina during the exam, Jane indicated that it hurt. The nurse took several swabs

---

[3] This court has not been provided with the video but the prepared transcript appears in the clerk's transcript.

7

of DNA from various parts of Jane's body. There were no visible injuries and sexual abuse could not be confirmed or negated.

Investigator Ortega determined that the lead suspect in the case was defendant. Investigator Ortega prepared a six-pack photographic lineup containing a photograph of defendant in photograph No. 3. The six-pack photographic lineup was shown to Jane on April 3, 2018. Jane immediately chose defendant as the person who touched her. Jane's mother was shown the photographic lineup and she chose defendant's photograph.

Investigator Ortega interviewed defendant at the sheriff's station in July 2018. Defendant was told that they were there to discuss an incident that occurred in March 2018 and defendant gave the impression he understood what they were talking about. Defendant insisted that the incident involving Jane was just a misunderstanding. He admitted he hugged her with his right arm over her shoulders. Defendant stated that prior to the hug, Jane had been doing cartwheels in front of her apartment. He gave her a five-dollar bill. He swore that he grew up poor and wished that someone would have given him money for candy or ice cream. Jane told defendant "thank you," and that was the end of the encounter. He denied that he ever touched her vagina or buttocks. Defendant was asked why his DNA might be found on the clothing over Jane's private part and he responded " 'I don't know' " and " 'I wouldn't be able to tell you' " why. He denied that he rode his bicycle that night. DNA was collected from defendant at the end of the interview. Defendant was left alone in the interview room but the recording device was left on. He said to himself, "Oh God, let me out of this."

8

Deputy Adrian Ramirez went to the Mecca apartment complex on October 3, 2018, after a report was received from Mary's mother that defendant had kissed Mary the prior evening. Mary's clothes were collected. Mary's father was shown the six-pack photographic lineup and identified defendant. Mary's father had spoken with defendant after the incident. Defendant had denied everything and said Mary "was only scared." Defendant did not explain what he meant by Mary being scared.

Riverside County District Attorney Investigator Claudia Herrera was previously a deputy sheriff at the Riverside County Sheriff's Department and investigated defendant's case. She observed a forensic interview of Mary.

Mary was interviewed by Jacklyn Saldana on October 4, 2018. The interview was recorded and shown to the jury. She was nine years old and in the third grade. Mary explained that she was present at the interview because her parents were worried about her. She believed it was because the man who did maintenance at the apartment complex had kissed her on the cheek. He had called her name while she was standing outside her apartment. He then hugged her and gave her a kiss on the cheek. The man did not say anything to her. She started to cry because she was scared and her brother came outside. Her father went to talk to the man. Mary did not know the man's name. Mary was scared to see the man again in case it happened again.

Mary also was seen by a forensic nurse on October 3, 2018. Mary reported that a man had kissed her on the cheek and hugged her. Mary had no bruising or abrasions.

Investigator Herrera interviewed defendant in his apartment on November 1, 2018, regarding the incident involving Mary. Defendant asked initially if she was there to talk

to him about Jane and stated that the family had moved from the apartment complex. Investigator Herrera advised defendant she was there to discuss Mary. Defendant responded, " 'Oh. Oh, okay.' " Defendant explained that he had been outside watering and realized he left something on the stove in his apartment. As he was running back to his apartment, he bumped into Mary as he went around a corner. He placed his hands on her shoulders to keep her from falling. Defendant then continued running to his apartment to turn off the stove. Defendant turned off the stove and returned outside where he encountered Mary's father  Defendant told Mary's father that he bumped into Mary and that she got scared. Defendant denied that he kissed Mary. Investigator Herrera advised defendant that Mary had been interviewed and stated that he kissed her. He then stated that maybe it did happen but if he had kissed her it was only to motivate her not to be scared. He then stated he kissed her but his intentions were not to touch her or anything else.

Defendant took Investigator Herrera outside and showed her the route he took from watering the plants, to his apartment, and where he collided with Mary. Defendant also told Investigator Herrera that the incident with Jane was a misunderstanding and that he gave her five dollars so she could buy ice cream. Defendant had given other children in the apartment complex money to buy ice cream. The owner of the apartment complex had warned defendant not to buy ice cream for the children.

Defendant's apartment was searched and a bicycle was found. Clothes similar to the ones that defendant was described as wearing the night he touched Jane were also found.

## 2. *DEFENSE*

Mitchell Eisen was an expert in eyewitness memory and suggestibility. Eisen explained that people are not cameras and their memory is subject to suggestion and bias. A person's expectations can affect perceptions of what is happening in the environment around him or her. Eisen indicated that if a child had been repeatedly warned that a certain neighbor was bad, dangerous and touched little girls, and the child had an interaction with that man, there was an increased possibility that the child would misinterpret the man's actions during their encounter. It was important during forensic interviews not to ask suggestive questions. In his opinion, Mary's and Jane's interviewers used suggestive questions.

Dr. Roberto Flores De Apodaca was a forensic clinical psychologist. He completed an evaluation of defendant to determine if he showed the characteristics associated with a person who sexually molests children. He met with defendant for two hours. He asked questions about defendant's family history, mental health, and sexual history. Dr. Flores De Apodaca also considered the police reports in this case and that defendant had no prior sexual offenses. Defendant scored on the low end of committing sexual offenses. Dr. Flores De Apodaca concluded that it was "not clinically probable that [defendant] is fundamentally pedophilic in his sexual orientation." If the sexual allegations involving Mary and Jane were true, Dr. Flores De Apodaca surmised it may be due to defendant's use of alcohol, which showed he had problems with impulse control. Defendant also had feelings of inadequacy as a male as he did not have full-time

11

employment. He admitted that a person need not be diagnosed as a pedophile to molest children.

Experts testified that samples taken from the clothes and bodies of Mary and Jane did not contain defendant's DNA.

The owner of the apartment complex in Mecca, Jose Mendes, had defendant help with cleaning and taking care of landscaping to help pay his rent. Several children lived in the apartment complex in 2018. Mendes never saw defendant act inappropriately with any of the children. He became aware that on at least two occasions he gave children money for ice cream. Mendes told defendant that it was not right to give them money and defendant responded "that's not true." Defendant denied that he touched any children in the apartment complex and Mendes allowed him to continue to live in his apartment.

Defendant's wife testified that she and defendant had been together since 2001 and got married in 2017. She had observed defendant give money to some of the children in the apartment complex in order to buy ice cream. She never observed defendant do anything inappropriate with any of the children.

## DISCUSSION

Defendant contends there is insufficient evidence to support his convictions of committing lewd acts against Mary and Jane within the meaning of section 288, subdivision (a). He claims that "there was little evidence" that the unlawful touching occurred and no evidence that it was done with the intent of arousing, appealing to or

12

gratifying his or the two girls' sexual desires within the meaning of section 288, subdivision (a).

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

"Reviewing the sufficiency of evidence . . . necessarily calls for analysis of the unique facts and inferences present in each case, and therefore comparisons between cases are of little value." (*People v. Rundle* (2008) 43 Cal.4th 76, 137-138, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) "Because we must draw all inferences in support of the judgment, [a] defendant 'bears an enormous burden' when challenging the sufficiency of the evidence." (*People v. Vasco* (2005) 131 Cal.App.4th 137, 161.)

A violation of section 288, subdivision (a), "requires proof of the following elements:  [¶]  1. The defendant willfully touched any part of a child's body . . .; [¶] 2. The defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child; and [¶] 3. The child was younger than 14 years old at the time of the act." (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1160.)  " '*Any* touching of a child under the age of 14 violates this section, even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the intent to arouse or gratify the sexual desires of either the perpetrator or the victim.' [Citation.]  By focusing on the defendant's intent to sexually exploit a child rather than on the nature of the defendant's offending act, section 288 'assumes that young victims suffer profound harm whenever they are perceived and used as objects of sexual desire.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 404; see also *People v. Martinez* (1995) 11 Cal.4th 434, 442 (*Martinez*).)

"[A] lewd and lascivious act . . . can involve 'any part' of the victim's body." (*Martinez*, *supra*, 11 Cal.4th at p. 444.)  "Conviction under the statute has never depended upon contact with the bare skin or 'private parts' of the defendant or the victim." (*Ibid.*)  "[T]he lewd character of an activity cannot logically be determined separate and apart from the perpetrator's intent.  It is common knowledge that children are routinely cuddled, disrobed, stroked, examined, and groomed as part of a normal and healthy upbringing.  On the other hand, any of these intimate acts may also be undertaken for the purpose of sexual arousal.  Thus, depending upon the actor's motivation, innocent or sexual, such behavior may fall within or without the protective purposes of section

14

288. As the vast majority of courts have long recognized, the only way to determine whether a particular touching is permitted or prohibited is by reference to the actor's intent as inferred from all the circumstances." (*Id.* at p. 450.) Relevant factors include the charged act, other acts of lewd conduct charged in the case, the relationship between the parties, and any "coercion, bribery, or deceit used to obtain the victim's cooperation or to avoid detection." (*Id.* at p. 445.)

The evidence supporting that he committed lewd and lascivious acts against Jane Doe was substantial. Jane and defendant did not have a relationship. Jane initially told her mother and stepfather that she had been doing cartwheels outside when defendant approached her. He told her to do more cartwheels and then called her over to an area where there were some parked cars. It was dark. It was then that he grabbed her buttocks and vagina. She was "disgusted." Defendant gave her a five-dollar bill and told her to be quiet. This was strong evidence that defendant was attempting to bribe her into keeping quiet. Jane did not remain quiet. She immediately told her mother. Jane was crying and visibly upset when she told her mother.

Jane's recall of the incident was corroborated by the presence of the five-dollar bill outside her apartment. Further, she expressed to the forensic nurse that she had pain in her vaginal area. While Jane told the forensic interviewer that there were two instances when defendant touched her including in the open while doing cartwheels, and later by a car, she was consistent that defendant grabbed her buttocks and vaginal area. The jury was well aware of the inconsistencies in Jane's statements and could assess her credibility based on this evidence. This does not mean the evidence was insufficient.

15

Additionally, defendant did not deny being around Jane and insisted it was all just a misunderstanding.

There was ample evidence that Jane was touched by defendant. Further, grabbing her vagina and buttocks clearly showed his intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or Jane.

There was also ample evidence that defendant touched Mary. Mary stated that defendant came out of nowhere and immediately hugged and kissed her on the cheek. She was scared, crying, and dropped items she was carrying. Although they were in front of Mary's apartment, it was clear they were alone at the time. Mary immediately told her father and brother that defendant had kissed her. Mary's father confronted defendant and defendant did not deny being with Mary. He insisted that she was just scared. Further, Mary was consistent in reporting the incident. Mary was not friends with Jane.

As an isolated incident, it is true that there may not be enough evidence to support that such touching of Mary was committed with the intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of defendant or Mary. However, we must look to the circumstances surrounding the act, including the relationship between Mary and defendant, and the other sexual offenses. (*Martinez*, *supra*, 11 Cal.4th at p. 445.)

Defendant had no relationship with Mary. There was no prior interaction before the hug and kiss. The jury did not believe defendant that he had just "bumped into her" while going to his apartment. Further, based on the contact with Jane, which involved touching her private areas, it was reasonably inferred that kissing Mary was not based on his desire to just console her or as a friend. The jury could reasonably infer that

16

defendant kissed Mary with the intent to arouse, appeal to, or gratify the lust, passion or, sexual desires of himself or Mary.

Defendant relies on *People v. Mansell* (1964) 227 Cal.App.2d 842 to support his claim that there was insufficient evidence to support his conviction of committing lewd and lascivious acts against Mary. Initially, *Mansell* involved the dismissal of the case after a section 995 motion and is not relevant to a sufficiency of the evidence review after a jury trial. Moreover, *Mansell* involved three girls who sat on a neighbor's lap, and he had his hand "between their legs." The *Mansell* court rejected that this was evidence of lewd and lascivious conduct, finding "[i]nevitably some friendly but incautious adults will bounce little children on their knees, and necessarily the adults will touch the legs of the children in the process, and some other adults will assume the worst. But such commonplace behavior is not enough to support an inference of an intent to commit the atrocious crime described in Penal Code, section 288." (*Id.* at p. 848.) We agree with the court in *People v. Morales* (2018) 29 Cal.App.5th 471, which found, in rejecting *Mansell*, that "[t]he evidence in *Mansell* clearly supported an inference of lewd intent. An adult neighbor touched two little girls 'between their legs' and 'moved his fingers,' and he 'stopped' only when he noticed that his conduct had been observed. An examination of all of the circumstances reasonably supported an inference of lewd intent. Perhaps the opinion in *Mansell* was a product of its time, half a century ago, when our knowledge of child molestation was less developed. Nevertheless, we feel compelled to point out its invalidity so that it does not continue to impact our jurisprudence on this issue." (*Morales*, at p. 479.)

Based on all the evidence presented to the jury in this case, there was substantial evidence to support defendant's convictions of violating section 288, subdivision (a).

**DISPOSITION**

The judgment is affirmed in full.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
J.

We concur:

McKINSTER _____
Acting P. J.

FIELDS _____
J.